1   DENNIS J. HERRERA, State Bar #139669
    City Attorney
2   JESSE C. SMITH, State Bar #122517
    Chief Assistant City Attorney
3   RONALD P. FLYNN, State Bar #184186
    Chief Deputy City Attorney
4   YVONNE R. MERÉ, State Bar #173594
    Chief of Complex and Affirmative Litigation
5   TARA M. STEELEY, State Bar #231775
    SARA J. EISENBERG, State Bar #269303
6   AILEEN M. McGRATH, State Bar #280846
    Deputy City Attorneys
7   City Hall, Room 234
    1 Dr. Carlton B. Goodlett Place
8   San Francisco, California 94102-4602
    Telephone:     (415) 554-4748
9   Facsimile:     (415) 554-4715
    E-Mail:        brittany.feitelberg@sfcityatty.org
10
    Attorneys for Plaintiff
11  CITY AND COUNTY OF SAN FRANCISCO

12

13                      UNITED STATES DISTRICT COURT

14                    NORTHERN DISTRICT OF CALIFORNIA

15

16  CITY AND COUNTY OF SAN              Case No. 18-5146
    FRANCISCO,
                                        **COMPLAINT FOR DECLARATORY AND**
17          Plaintiff,                  **INJUNCTIVE RELIEF**

18          vs.

19  JEFFERSON B. SESSIONS III, Attorney
    General of the United States, LAURA L.
20  ROGERS, Acting Assist. Attorney General of
    the United States, UNITED STATES
21  DEPARTMENT OF JUSTICE, DOES 1-100,

22          Defendants.

23

24

25

26

27

28

**INTRODUCTION**

1. During his campaign, President Trump pledged to end federal funding to sanctuary cities.  Despite the determination by these cities that their sanctuary laws and policies make their own communities safer, healthier and stronger, his Administration has spent more than eighteen months trying to coerce them to abandon those laws and policies by threatening to defund them.  The Trump Administration's two attempts to do so have been rebuffed by the federal courts.

2. First, President Trump signed an executive order directing the Attorney General and Secretary of Homeland Security to ensure that "sanctuary jurisdictions" did not receive federal funds.  A court in this district struck it down.  Next, the Department of Justice ("DOJ") attempted to impose immigration-related requirements on FY 2017 Byrne JAG funds.  Every single court that has examined the validity of these requirements has found them to be unconstitutional.

3. DOJ's latest effort should fare no better.  DOJ recently announced that it is again attempting to coerce sanctuary jurisdictions into changing their laws and policies by imposing unconstitutional requirements on important criminal justice grant funding.  Some of the new requirements DOJ has imposed on the FY 2018 Byrne JAG funds (*e.g.*, those that require jurisdictions to give immigration authorities both unfettered access to their jails and 48 hours' notice before releasing an individual believed to be in the country illegally) are nothing more than repackaged versions of the FY 2017 requirements that courts across the country have struck down.  But others go much further.  Indeed, the new requirements cast a threatening pall over sanctuary jurisdictions by implying that they may be violating federal criminal laws simply by having laws or policies that limit entanglement with federal immigration policies.

4. These extortive requirements are unlawful.  As a threshold matter, DOJ lacks the statutory authority to impose them.  The Constitution establishes a balance of power between the state and federal governments, as well as among the coordinate branches of federal government, to prevent the excessive accumulation of power in any single entity and reduce the risk of tyranny and abuse from any government office.  An executive branch agency of the federal government may not seize for itself the power that the Constitution reserves for Congress.  Nor may it intrude on authority that the Constitution has preserved for state and local governments.  The FY 2018 grant requirements violate

both of these precepts. DOJ is improperly attempting to wield powers that only Congress is entitled to invoke, and is seeking to compel San Francisco to bend its considered policy judgments, which the Constitution allows it to make for its community, to the federal government's will.

5.     And even if DOJ has the authority to impose *some* conditions on the FY 2018 Byrne JAG funds, each of the Challenged Requirements at issue here relating to federal immigration enforcement would still be unlawful under other constitutional limits. Those limits prevent DOJ from requiring compliance with the funding requirements because (1) they leave localities unclear about how to comply with each of the requirements, and (2) they lack a nexus between the congressionally mandated purpose of Byrne JAG funds and immigration enforcement.

6.     San Francisco faces the immediate prospect of losing over $1.4 million in this fiscal year if it does not receive FY 2018 Byrne JAG funds. San Francisco uses these funds for a variety of important law enforcement purposes, including programs designed to reduce recidivism, provide alternative forms of prosecution, or enable drug treatment for underserved populations.

7.     San Francisco faces an unacceptable choice that is precisely what the Trump Administration wishes it to have: either comply with DOJ's unconstitutional new grant conditions and abandon local policies that San Francisco adopted to promote public safety and foster trust and cooperation between law enforcement and the public; or, maintain these policies but forfeit critical funds that it relies on to provide essential services to San Francisco residents.

8.     San Francisco is not obligated to enforce federal immigration law. San Francisco seeks declaratory and injunctive relief to ensure that San Francisco and other sanctuary jurisdictions continue to be eligible for these funds, instead of being coerced into accepting conditions that on their face violate bedrock constitutional principles of separation of powers, as well as constitutional vagueness and germaneness restrictions on grant requirements.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction under 28 U.S.C. Sections 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201(a) and 2202 *et seq.*

//

10.     Venue properly lies within the Northern District of California because Plaintiff, San Francisco, resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this District.  28 U.S.C. §1391(e)(1).

**INTRADISTRICT ASSIGNMENT**

11.     Assignment to the San Francisco or Oakland Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because a substantial part of the acts or omissions that give rise to this action occurred in the City and County of San Francisco.

**PARTIES**

12.     Plaintiff San Francisco is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

13.     Defendant Jefferson B. Sessions III is the Attorney General of the United States.  He is sued in his official capacity.  The Attorney General is the federal official leading the DOJ, which is responsible for the governmental actions at issue in this lawsuit.

14.     Defendant Laura L. Rogers is Acting Assistant Attorney General of the United States in charge of the Office of Justice Programs, which administers Byrne JAG funding.  She is sued in her official capacity.

15.     Defendant DOJ is an executive department of the United States of America that is responsible for administering the Byrne JAG program.

16.     Doe 1 through Doe 100 are sued under fictitious names.  Plaintiff San Francisco does not now know the true names or capacities of said Defendants, who were responsible for the alleged violations, but pray that the same may be alleged in this complaint when ascertained.

**FACTUAL ALLEGATIONS**

**I.      The Byrne JAG Program Provides Important Criminal Justice Funds To San Francisco.**

   **A.      The Byrne JAG Program.**

17.     The Byrne JAG program is "the leading source of federal justice funding to state and local jurisdictions."  Office of Justice Programs, *Welcome to BJA's Edward Byrne Memorial Assistance Grant (JAG) Program*, https://www.bja.gov/jag/ (last visited August 20, 2018).  The program provides state and local governments with "critical funding necessary to support a range of

program areas including law enforcement, prosecution, indigent defense, courts, crime prevention and education, corrections and community corrections, drug treatment and enforcement, . . . crime victim and witness initiatives and mental health programs." *Id.*

18.     The program is structured as a formula grant, awarding funds to all eligible grantees according to a prescribed metric.  Unlike discretionary grants, which agencies award under agency discretion, "'formula' grants . . . are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula."  *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989).  Specifically, the Bureau of Justice Assistance ("BJA")—a department within Office of Justice Programs ("OJP")—awards Byrne JAG funds to all eligible grantees in amounts based on Bureau of Justice Statistics ("BJS") calculations derived from the Byrne JAG statutory formula.  *See* 34 U.S.C. § 10156(d)(2)(A) (providing that the Attorney General "*shall* allocate to each unit of local government" funds consistent with the established formula) (emphasis added).

19.     The formula for state allocations is a function of population and violent crime.  *See id.* § 10156(a).  For local governments, the allocation is based on the state's allocation and the ratio of violent crime in the locality to violent crime in the state.  *See id.* § 10156(d).  For example, in FY 2018, California's total allocation is $28.9 million.  Of this, $17.4 million (60 percent) is allocated to the State (*see id.* § 10156(b)-(d))—but a minimum of 62.9 percent of these funds must be passed through to local jurisdictions.[1]  The other $11.6 million (40 percent) is allocated for direct grants to local jurisdictions.  *See id.* § 10156(b)-(d).

20.     Congress imposed only a limited number of requirements on Byrne JAG applicants.

21.     First, Congress has required applicants to supply information about their intended use of grant funding, to demonstrate that they will spend the money on programs supporting one of the eight statutory purpose areas.  *See* 34 U.S.C. § 10153(a)(2) & (a)(5)(A)-(C).  Those purpose areas are: (1) law enforcement, (2) prosecution and courts, (3) prevention and education, (4) corrections and

---

[1] U.S. Dep't of Justice, *Edward Byrne Memorial Justice Assistance Grant (JAG) Program Frequently Asked Questions (FAQs)–Updated August 2017*, at 2, https://www.bja.gov/Funding/JAGFAQ.pdf; *see also* U.S. Dep't of Justice,  FY 2014 Justice Assistance Grant (JAG) Program Variable Pass-through (VPT) Percentages, https://www.bja.gov/Funding/JAGvpt.pdf.

community corrections, (5) drug treatment, (6) planning, evaluation, and technology improvement, (7) crime victim and witness programs, and (8) mental health programs, including behavioral programs and crisis intervention.  34 U.S.C. § 10152(a)(1)(A)-(H).  None of these program purposes include federal immigration enforcement.

22.     Second, Congress requires applicants to maintain and be prepared to report information demonstrating that they possess programmatic and financial integrity.  *Id.* § 10153(a)(4).

23.     Finally, Congress requires applicants to "certif[y]" that they "will comply with all provisions of this part and all other applicable Federal laws."  *Id.* § 10153(a)(5)(D).

24.     Not one of these requirements relates to immigration.  Indeed, over a decade ago, Congress removed the only requirement in the Byrne JAG statute that touched on immigration-related issues.  In 2006, Congress specifically eliminated a funding requirement that recipients make "[a]n assurance that the State has established a plan under which the State will provide without fee to the Immigration and Naturalization Service, within 30 days of the date of their conviction, notice of conviction of aliens who have been convicted of violating the criminal laws of the State and under which the State will provide the Service with the certified record of such a conviction within 30 days of the date of a request by the Service for such record."  42 U.S.C. § 3753(a)(11) (2002).

25.     Given the limited discretion Congress has bestowed upon DOJ under the Byrne JAG statute for these formula grants, the Attorney General has no authority to withhold or reduce federal grant funding a state or local government is entitled to receive.  DOJ officials acknowledged as much in the recent past, when then-Assistant Attorney General Peter Kadzik wrote a letter to Senator Richard Shelby regarding the Senator's request that DOJ tie federal grant funding to federal immigration priorities.  Kadzik stated that DOJ could not do so because "many Department grant funds are formula based" such that "the Department does not have the discretion to suspend funding at all."[2]

//

//

---

[2] Defendants' Administrative Record, *City and County of San Francisco v. Sessions*, No. 3:17-cv-4642-WHO ("*San Francisco v. Sessions*") (N.D. Cal. Mar. 23, 2018), Dkt. No. 84-2 at AR00113.

**B.      San Francisco Uses Byrne JAG Funding To Support Important City Programs.**

26.      The San Francisco Department of Children, Youth and their Families ("DCYF")

applies for local Byrne JAG funds and state pass-through funds on behalf of the City.  DCYF keeps a

portion of the grant and also administers grant funds to the following departments: the Adult Probation

Department, District Attorney, Public Defender, Police Department, and Sheriff.  DCYF also passes

through funds from the local grant to the San Francisco Superior Court and a third party evaluator.

27.      Before FY 2017, San Francisco received state and local Byrne JAG funds every year

for well over a decade.

28.      San Francisco submitted its FY 2017 Byrne JAG application on September 5, 2017, but

OJP has not yet taken action on it.[3]

29.      San Francisco submitted its FY 2018 Byrne JAG application on August 21, 2018.

30.      For FY 2018, San Francisco is entitled to a direct Byrne JAG formula grant of

$489,966.  San Francisco also expects to receive a state pass-through of Byrne JAG funds in the

amount of $941,915.

31.      Consistent with the Byrne JAG statute, San Francisco uses its Byrne JAG funds to

support critical law enforcement programs designed to reduce criminal behavior and improve public

safety.  Specific programs funded with this grant include: (1) Law Enforcement Assisted Diversion, an

innovative approach that seeks to accomplish the goals of reduced criminal behavior and improved

public safety by connecting appropriate low-level drug offenders with services; (2) Focused Drug

Deterrence, short and long term proactive activities including targeted investigations and enforcement

and social network analysis to increase the identification of individuals involved in high-level drug

markets; (3) Drug Court Prosecution, which seeks to connect criminal defendants who suffer from a

---

[3] DOJ has, on information and belief, awarded FY 2017 Byrne JAG grants to hundreds of other
jurisdictions—"jurisdictions that share the Department's commitment to keeping criminal aliens off
our streets and our law abiding citizens safe."  Press Release, U.S. Dep't of Justice, DOJ Releases
FY17 JAG Funding (June 27, 2018)
https://content.govdelivery.com/accounts/USDOJOJP/bulletins/1fa6e57.  DOJ has stated that
"[r]eviews of some applications remain ongoing."  *Id.*  In litigation, DOJ has stated that it is
withholding FY 2017 Byrne JAG awards from states and localities, like San Francisco, whose
compliance with Section 1373 is under review.  Decl. of Marilyn Atsatt at ¶¶ 3-4, *San Francisco v.
Sessions*, Dkt. No. 113-3.

substantial substance abuse problem to treatment services in the community in order to enhance public safety, reduce recidivism, and find appropriate dispositions to the criminal charges; (4) Targeted Drug Treatment for Underserved Populations, a treatment intervention conducted by the Sheriff's Department for individuals in custody; (5) Intensive Probation Supervision, a targeted caseload of probationers with substance abuse and/or mental health issues; (6) Reentry Social Work through the Public Defender's Office, which provides legal and wraparound support to help indigent clients charged with felony drug cases and other felony offenses successfully exit the criminal justice system; and (7) Citywide Justice-Involved Youth Planning, which examines current criminal justice trends impacting youth and young adults and strengthens partnerships and collaboration at various levels to create a continuum of support for youth and young adults.

32.     San Francisco uses Byrne JAG pass-through funds to support a Young Adult Court aimed at reducing recidivism for youth ages 18-25.  This Court was designed in response to a growing body of neuroscience research showing that young adults are fundamentally different from both juveniles and older adults in how they process information and make decisions.  Our traditional justice system is not well-equipped to address cases involving these individuals, who are qualitatively different in development, skills, and needs from both children and older adults.  The Young Adult Court fills this gap by providing case management and other support for eligible young adult offenders from high-risk backgrounds.

33.     These City programs span six departments, and a total of approximately ten full-time equivalent positions for these programs are funded with Byrne JAG funds.  Without local and state Byrne JAG funds, San Francisco could be forced to reduce or eliminate these programs, including eliminating staff positions, unless other funding sources could be identified.

## II.     The Trump Administration Has Engaged In Ongoing Attempts To Coerce Sanctuary Jurisdictions To Change Their Policies By Threatening To Withhold Federal Funding.

34.     Despite the Byrne JAG program being a formula grant—which means that Congress alone can decide who receives federal funding, and how much—and in disregard of the important local purposes that Byrne JAG funding serves, President Trump's Administration has engaged in a longstanding campaign to unlawfully withhold federal funding from so-called sanctuary jurisdictions.

The Attorney General has furthered this effort by adding an ever-expanding set of immigration-related requirements to Byrne JAG funding.  These requirements are designed to coerce state and local jurisdictions to participate in enforcing federal immigration law and abandon any state or local policies that limit or prohibit such participation.  That is, the requirements aim to eradicate sanctuary cities, consistent with President Trump's longstanding threats.

### A.      President Trump First Attempted To Act By Executive Fiat.

35.      San Francisco is one of many jurisdictions across the country that has enacted sanctuary policies that seek to promote public safety locally and build trusting and supportive relationships with immigrant communities.  Many jurisdictions believe—and studies have shown[4]—that communities are stronger, healthier, and safer when state and local employees decline to participate in the federal government's responsibility to enforce federal immigration law.

36.      Nevertheless, the Trump Administration has made it their mission to eradicate sanctuary cities.  President Trump frequently promised to "defund" sanctuary cities, and to use the threat of withholding federal funds as "a weapon" to coerce local jurisdictions to change their policies.[5]  Shortly after President Trump took office, his press secretary confirmed that "[w]e are going to strip federal grant money from the sanctuary states and cities that harbor illegal immigrants.  The American people are no longer going to have to be forced to subsidize this disregard for our laws."[6]

37.      The Attorney General echoed this position.  Soon after taking office, the Attorney General suggested that he would use every means necessary to withhold federal funding from "sanctuary cities."[7]  He has broadly described sanctuary city "policies" as those requiring local law

_____

[4] *See* Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, CTR. FOR AM. PROGRESS (Jan. 26, 2017), https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ (concluding that crime rates in sanctuary counties are statistically significantly lower than crime rates in non-sanctuary counties).

[5] Alexander Mallin and Lissette Rodriguez, *Trump Threatens Defunding Sanctuary Cities as 'Weapon'*, ABC News (Feb. 5, 2017), http://abcnews.go.com/Politics/trump-threatens-%20defunding-sanctuary-states-weapon/story?id=45286642.

[6] The White House, *1/25/17: White House Press Briefing*, YouTube (Jan. 25, 2017), https://www.youtube.com/watch?v=OaPriMVvtZA.

[7] Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions (Mar. 27, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions.

enforcement officials to "refuse to cooperate with federal immigration authorities regarding illegal aliens who commit crimes."[8]

38.      The Administration tried to carry through on these threats during President Trump's first week in office.  President Trump issued Executive Order 13,768, which called for denying all federal funding to sanctuary jurisdictions and further authorized the Attorney General to take unspecified enforcement action against sanctuary cities.

39.      The Administration touted the Executive Order as a means to achieving the President's goal of "ending sanctuary cities . . . .  [T]he President has been very clear through his executive order that federal funds, paid for by hardworking taxpayers, should not be used to help fund sanctuary cities."[9]  The Administration vowed that "the President is going to do everything he can within the scope of the executive order to make sure that cities who don't comply with it—counties and other institutions that remain sanctuary cities don't get federal government funding in compliance with the executive order."[10]

40.      The Administration's efforts here were stopped by a court in this district, which permanently enjoined Section 9(a) of the Executive Order for violating the Constitution.  *City and County of San Francisco v. Donald J. Trump*, 275 F. Supp. 3d 1196, 1219 (N.D. Cal. 2017).  The court held, *inter alia*, that the President—and in turn the Attorney General and the Secretary of DHS— lacked the authority "to place a new condition on federal funds . . . not authorized by Congress," and thus had violated the "fundamental constitutional structure" of the separation of powers.  *Id.* at 1213.  And the court further held that even if the executive branch could exercise that spending power, the Executive Order was unconstitutional because it (1) used vague language that left localities unclear

---

[8] Press Release, U.S. Dep't of Justice, Attorney General Jeff Sessions Delivers Remarks in Las Vegas to Federal, State and Local Law Enforcement About Sanctuary Cities and Efforts to Combat Violent Crime (July 12, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-las-vegas-federal-state-and-local-law.

[9] Press Release, The White House, Office of the Press Secretary, Press Briefing by Press Secretary Sean Spicer, 2/1/2017, #6 (Feb. 1, 2017), https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sean-spicer-020117/.

[10] Press Release, The White House, Office of the Press Secretary, Press Briefing by Press Secretary Sean Spicer, 2/8/2017, #10 (Feb. 8, 2017), https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sean-spicer-020817/.

how to comply with the funding conditions; (2) lacked any nexus between the funds at issue and immigration enforcement; and (3) sought to compel local governments to "adopt certain policies" that they had determined, in their considered judgment, to be unwise.  *Id.* at 1214–16.

41.     The Ninth Circuit Court of Appeals upheld substantially all of the district court's order. *City and County of San Francisco v. Trump*, No. 17-17478, 2018 WL 3637911 (9th Cir. Aug. 1, 2018).  The Ninth Circuit affirmed that "[t]he Separation of Powers was an integral part of the Founders' design."  *Id.* at *2.  And it found that "the Administration has not even attempted to show that Congress authorized it to withdraw federal grant moneys from jurisdictions that do not agree with the current Administration's immigration strategies."  *Id.* at *4.  It therefore upheld the district court's judgment in favor of San Francisco on the merits.  *Id.*  The Ninth Circuit remanded the cases for additional factual findings about the proper scope of relief.  *Id.* at *13.

**B.     The Attorney General Unilaterally Imposes Immigration-Related Requirements On The FY 2017 Byrne JAG Program.**

42.     With its initially broad efforts to withhold federal funds to sanctuary cities put in check by the courts, the Administration adopted a more targeted approach focusing on the Byrne JAG program and similar grant programs that DOJ administers.  As relevant here, the Attorney General unilaterally imposed three new immigration-related requirements on the 2017 Byrne JAG awards— requirements designed to coerce Byrne JAG recipients into enforcing federal immigration law.

43.     **First**, the FY 2017 Byrne JAG Local Solicitation provided that OJP would require grant applicants to "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien under the Immigration and Nationality Act."  FY 2017 Local Solicitation at 30 (attached as Exh. 1).

44.     In the FY 2017 award documents that DOJ eventually issued, DOJ expanded on this requirement (the "FY 2017 Notice Requirement"), explaining that:

> A State statute, or a State rule, -regulation, -policy, or –practice, must be in place that is designed to ensure that, when a State (or State-contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in

such facility, then such facility will honor such request and—as early as practicable (see para. 4.B. of this condition)—provide the requested notice to DHS.

Decl. of Alan Hanson at ¶¶ 5-6 & Exh. B at 18, *San Francisco v. Sessions*, Dkt. No. 46-1 ("Hanson Decl.").

45.    **Second**, the FY 2017 Local Solicitation provided that OJP would require grant applicants to "permit personnel of the U.S. Department of Homeland Security (DHS) to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States." FY 2017 Local Solicitation at 30 (attached as Exh. 1).

46.    In the FY 2017 award documents, DOJ described this requirement regarding access to correctional facilities (the "FY 2017 Access Requirement") as requiring that:

> A State statute, or a State rule, -regulation, -policy, or –practice, must be in place that is designed to ensure that agents of the United States acting under color of federal law in fact are given to access any State (or State-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States.

Hanson Decl. at ¶¶ 5-6 & Exh. B at 18.

47.    **Third**, DOJ stated that it would require jurisdictions to certify their compliance with 8 U.S.C. Section 1373, which provides that a "local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status . . . of any individual." 8 U.S.C. § 1373(a). Although DOJ's move toward requiring jurisdictions to certify compliance with this section had been in progress since 2016, it was not until the FY 2017 Byrne JAG application that DOJ expressly applied this requirement (the "FY 2017 Section 1373 Requirement") to all jurisdictions.

48.    Critically, since the Trump Administration has come into office, DOJ has declared that it interprets Section 1373 much more broadly than local jurisdictions like San Francisco could have previously imagined—specifically, that it reads "information regarding the citizenship or immigration status" to include all information that would assist federal immigration authorities to determine a

1    person's immigration status and take that individual into custody, if appropriate.[11]  (The FY 2017

2    Section 1373 Requirement, FY 2017 Notice Requirement, and FY 2017 Access Requirements are

3    referred to collectively as the "FY 2017 Requirements.")

4         49.    DOJ claimed that two different general statutory provisions gave the Attorney General

5    the authority to impose these FY 2017 Requirements on Byrne JAG recipients.  DOJ claimed that 34

6    U.S.C. § 10153(a)(5)(D), which requires Byrne JAG grant recipients to certify that they "will comply

7    with all provisions of this part and all other applicable Federal laws" (*see* ¶ 23, *supra*), allowed the

8    Attorney General to require that grant recipients comply with Section 1373.  Defs.' Mot. for Summ. J.

9    at 17-18, *San Francisco v. Sessions*, Dkt. No. 113.

10        50.    DOJ took a different approach with respect to the FY 2017 Notice and Access

11   Requirements.  DOJ did not argue that either Requirement stemmed from an existing statutory

12   obligation, and thus did not assert that Section 10153(a)(5)(D)'s "all applicable laws" language

13   allowed the Attorney General to impose them.  Instead, DOJ relied on a different statutory provision,

14   34 U.S.C. § 10102(a)(6)—which allows the Assistant Attorney General overseeing OJP to "exercise

15   such other powers and functions as may be vested in [him or her] pursuant to this chapter or by

16   delegation of the Attorney General, including placing special conditions on all grants, and determining

17   priority purposes for formula grants."  *See* Defs.' Mot. for Summ. J. at 9-14 *San Francisco v. Sessions*,

18   Dkt. No. 113.  DOJ asserted that the FY 2017 Notice and Access Requirements were special

19   conditions covered by this provision.

20        51.    The new FY 2017 Requirements elicited a wave of legal challenges, and several courts

21   have already struck them down—indeed to date all the federal courts that have considered those

22   requirements have found them unlawful.  *See City of Chicago v. Sessions*, 888 F.3d 272, 276 (7th Cir.

23   2018) (invalidating FY 2017 Notice and Access Requirements); *see also City of Philadelphia v.

24   Sessions*, 309 F. Supp. 3d 289, 321 (E.D. Pa. 2018) (striking down all three FY 2017 Requirements);

---

[11] Defs.' Mot. for Summ. J. at 26, *San Francisco v. Sessions*, Dkt. No. 113 (asserting that Section 1373 "reach[es] the types of information critical in applying the 'immigration laws,' including the 'removal of aliens.'")

*City of Chicago v. Sessions*, No. 17-C 5720, 2018 WL 3608564, *12 (N.D. Ill. July 27, 2018) (striking down all three FY 2017 Requirements).

52.     Various other lawsuits challenging the FY 2017 Requirements remain pending[12] — including San Francisco's lawsuit currently pending in this district.[13]

**III.     The Attorney General Imposes New Requirements On FY 2018 Byrne JAG Recipients.**

53.     Now that its previous efforts to withhold federal grant funds have been held unlawful by courts around the country, President Trump's Administration is trying another approach to turn the Byrne JAG program into a weapon against sanctuary jurisdictions.

54.     On July 20, 2018, DOJ announced that it would impose a number of immigration-related conditions on jurisdictions seeking 2018 Byrne JAG funding.[14]

55.     Some of these new requirements are little more than a dressed up version of the Administration's earlier efforts: The 2018 Local Solicitation includes a Section 1373 Requirement that

---

[12] *State of California v. Sessions*, No. 17-CV-4701 (N.D. Cal. filed Aug. 14, 2017); *City of Evanston v. Sessions*, No. 18-cv-4853 (N.D. Ill. filed July 16, 2018), *City of Los Angeles v. Sessions*, No.2:17-cv-07215-R-JCx (C.D. Cal. filed Sept. 29, 2018); *City of New York v. Sessions*, No. 18-cv-06474 (S.D.N.Y. filed July 18, 2018); *State of Illinois v. Sessions*, No. 1:18-cv-04791 (N.D. Ill. filed July 12, 2018): *State of New York v. U.S. Dep't of Justice,* No. 1:18-cv-06471 (S.D.N.Y. filed July 18, 2018).

[13] *San Francisco v. Sessions*, No. 3:17-cv-04642 (N.D. Cal filed Aug. 11, 2017).  San Francisco's First Amended Complaint in that lawsuit challenges DOJ's authority to impose the three FY 2017 Requirements.  The district court has already denied DOJ's efforts to dismiss the case.  Order Den. Mot. to Dismiss, *San Francisco v. Sessions,* Dkt. No. 78.  Cross-motions for summary judgment are currently pending in that case, and are presently scheduled to be heard on September 5, 2018.  In its Motion for Summary Judgment, San Francisco seeks a declaratory judgment that the three FY 2017 Requirements are unlawful, as well as a permanent injunction prohibiting DOJ from imposing those Requirements on any current or future Byrne JAG awards.  City and Cty. of S.F.'s Notice of Mot. and Mot. for Summ. J., *San Francisco v. Sessions,* Dkt. No. 99.

[14] DOJ has also announced that it will impose similar grant requirements on a number of other public safety grants, including (1) Supporting Innovation: Field-Initiated Programs to Improve Officer and Public Safety; (2) Justice Accountability Initiative: Pilot Projects Using Data-driven Systems to Reduce Crime; (3) Gang Suppression Planning: Build Capacity for a Multilateral Data-Driven Strategy to Promote Public Safety; and (4) A Law Enforcement and Prosecutorial Approach To Address Gang Recruitment of Unaccompanied Alien Children program.  Press Release, U.S. Dep't of Justice, Department of Justice Announces New Immigration Compliance Requirements for FY 2018 Grants (June 28, 2018) https://www.justice.gov/opa/pr/department-justice-announces-new-immigration-compliance-requirements-fy-2018-grants  In addition to imposing these requirements, DOJ has also stated that it will "allow for preferential consideration of a grant application where the applicant plans to use immigration-cooperation tactics to address public safety in their jurisdiction."  *Id.*  In the course of announcing those new requirements, the Attorney General stated that they are designed to "encourage these 'sanctuary' jurisdictions to change their policies that undermine public safety."  *Id.*

is virtually indistinguishable from the FY 2017 version—even though that Certification has now been held invalid by multiple courts. *See* ¶ 51, *supra*. And it includes repackaged efforts to require jurisdictions to provide notice of an inmate's release and access to correctional facilities when immigration officials request it—requirements that DOJ now attempts to tie to a statutory obligation, despite its inability to do so over the previous year of litigation regarding the FY 2017 Notice and Access Requirements.

56. But other new FY 2018 Requirements go much further. DOJ has added several new requirements that imply that sanctuary jurisdictions interfere with various federal laws and regulations—even though those laws and regulations impose *no obligations whatsoever* on states and local jurisdictions. And they further suggest that sanctuary jurisdictions may violate federal criminal laws simply by having laws that limit entanglement with federal immigration policies. This is a considerable escalation in the level of the threat the Trump Administration has sought to achieve.

57. Each of these FY 2018 Requirements is unlawful because DOJ lacks the statutory authority to impose it. And even if DOJ had that authority, constitutional limits would still prevent it from requiring compliance with these particular conditions.

**A.  The FY 2018 Section 1373 Requirement.**

58. Although multiple courts have found the FY 2017 Section 1373 Requirement invalid, DOJ is attempting to impose a virtually identical requirement on 2018 Byrne JAG funds.[15] *See* FY 2018 Local Solicitation at 36 (attached as Exh. 2).

59. As it did for FY 2017, DOJ is requiring San Francisco to certify that, as to the "program or activity" funded with Byrne JAG dollars, San Francisco does not have in effect, purport to have in effect, or is subject to or bound by "any prohibition or any restriction . . . that deals with either (1) a government entity or –official sending or receiving information regarding citizenship or immigration

---

[15] The FY 2018 Section 1373 Requirement differs from the FY 2017 version in only two ways. First, the FY 2018 Section 1373 Requirement also requires that Byrne JAG recipients certify that they do not violate 8 U.S.C. § 1644 ("Section 1644"), which imposes identical obligations to those that Section 1373 itself mandates. FY 2018 Local Solicitation at 36 (attached as Exh. 2); *see also id*. at 42 (attached as Exh. 2). Second, the FY 2018 Section 1373 Requirement demands that jurisdictions seeking to accept a FY 2018 Byrne JAG award provide OJP with "[i]nformation regarding Communications with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)." FY 2018 Local Solicitation at 27 (attached as Exh. 2).

status as described in 8 U.S.C. §§ 1373(a) and 1644; or (2) a government entity or agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b)."  FY 2018 Local Solicitation at 43 (attached as Exh. 2); *see also* FY 2017 Local Solicitation at 38 (attached as Exh. 1).

60.    Although a FY 2018 Byrne JAG applicant is not required to execute the Section 1373 Certification to *apply* for a FY 2018 Byrne JAG award, OJP has stated that an applicants will be unable to *accept* an award until the certification is completed and received by OJP.  FY 2018 Local Solicitation at 27 (emphasis added) (attached as Exh. 2).

61.    San Francisco has already challenged the legality of the FY 2017 Section 1373 Requirement in *San Francisco v. Sessions*.  *Id.,* First Am. Compl. at ¶¶ 78-93, 177-192, Dkt. No. 61. San Francisco has sought relief that would enjoin Defendants from imposing the requirement on "*any* Byrne JAG awards" and would declare the requirement unconstitutional.  *Id.* at 41-42 (emphasis added).  San Francisco's pending motion for summary judgment seeks a permanent nationwide injunction on this issue.  City and Cty. of S.F.'s Notice of Mot. and Mot. for Summ. J. at 1, *San Francisco v. Sessions*, Dkt. No. 99.

62.    Because the legality of DOJ's attempts to require jurisdictions to certify compliance with Section 1373 is already the subject of pending litigation between the parties, San Francisco is not now bringing a separate challenge to the FY 2018 Section 1373 Requirement in this case.  But San Francisco reserves its right to seek to amend this Complaint later to add a challenge to the FY 2018 Section 1373 Requirement as appropriate.  The focus of this case is on the other immigration-related conditions.

**B.    The Section 1226 (Notice) Requirement.**

63.    OJP has also stated that it will require Byrne JAG recipients to make certifications related to a host of other federal laws contained in the Immigration and Nationality Act.  Specifically, Byrne JAG applicants' Chief Legal Officer will have to execute a document called "Local Government: FY 2018 Certification Relating to 8 U.S.C. §§ 1226(a) & (c), 1231(a)(4), 1324(a), 1357(a) & 1366(1) & (3)" (hereafter, "Immigration-Related Certification").  A copy of the

Immigration-Related Certification can be found at page 45 of the FY 2018 Local Solicitation.  For ease of reference, it is also attached independently as Exhibit 3 to this Complaint.

64.     A FY 2018 Byrne JAG applicant is not required to submit the Immigration-Related Certification in order to apply for a FY 2018 Byrne JAG award.  But an "applicant will be unable to make a valid award acceptance" until the certification is completed and "received by OJP on or before the day the unit of local government submits an executed award document."  FY 2018 Local Solicitation at 27 (emphasis omitted) (attached as Exh. 2).

65.     Among other things, the Immigration-Related Certification requires the Chief Legal Officer—in San Francisco's case, City Attorney Dennis J. Herrera—to certify that San Francisco has no policies or practices that would or do impede federal officers' exercise of authority relating to 8 U.S.C. Section 1226.  Specifically,  City Attorney Herrera has to certify:

a.     that he has conducted a "careful[] review[]" of Section 1226;

b.     that he has conducted (or caused to be conducted) a diligent inquiry and review of "the 'program or activity' to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program" as well as "any laws, rules, policies, or practices . . . that implicate any of the requirements related to" Section 1226; and

c.     that, as to the "program or activity" funded with Byrne JAG dollars, San Francisco does not have in effect or purport to have in effect, and is not subject to or bound by, "any law, rule, policy, or practice . . . that would or does . . . impede the exercise by federal officers of authority relating to 8 U.S.C. § 1226(a) & (c)."  (Together, these are referred to in this Complaint as "Section 1226 Requirement.")

66.     The Section 1226 Requirement appears to be nothing more than a repackaged version of the FY 2017 Notice Requirement, which DOJ now for the first time attempts to connect to a statutory provision.

67.     Section 1226 authorizes arresting and detaining certain undocumented immigrants, and provides that the federal government "shall take into custody" certain criminal aliens "when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation . . . ."  8 U.S.C. § 1226(a) & (c)(1); *see also* FY 2018 Local Solicitation at 47 (attached as Exh. 2).

68.     Section 1226's terms apply solely to the federal government—indeed, solely to the Attorney General himself.  It does not impose *any obligations whatsoever* on local governments.

69.     Nonetheless, OJP is attempting to use it as a hook to require state and local jurisdictions to provide notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody.

70.     In the body of the FY 2018 Local Solicitation, OJP has given one example of conduct that it believes "impedes" federal officials' exercise of their duties under Section 1226.  OJP states that grant recipients will be required to not "impede" the exercise of the authority of the federal government under Section 1226 "*specifically by requiring such recipients to provide (where feasible) at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody* when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act."  FY 2018 Local Solicitation at 36-37 (emphasis added) (attached as Exh. 2).

71.     DOJ lacks the authority to impose the Section 1226 Requirement on Byrne JAG recipients.  Nothing in the Byrne JAG statute—or any other federal law—gives the Attorney General the authority to impose this condition.

72.     Furthermore, the Section 1226 Requirement is ambiguous as to what jurisdictions must do to be in compliance.  Although OJP offers one example of what it might mean to "impede" federal officials in performing their duties under Section 1226, San Francisco has no way to know whether OJP might consider other practices to so "impede" the federal government.  This is particularly true given that OJP's example of what jurisdictions must do to avoid impeding the Attorney General's performance of his Section 1226 duties is far afield from anything that provision itself requires.

73.     Indeed, even the example OJP gives is itself ambiguous.  For example, DOJ's request for 48 hours' advance notice does not explain whether notice must be given only when the scheduled release date and time is known at least 48 hours in advance, or whether it requires jurisdictions to hold inmates in custody for additional time to provide a full 48-hour period of notice to ICE.  Actual release dates and time often deviate from scheduled release dates and times.

74.     Also, the Section 1226 Requirement is not germane to the purposes of the Byrne JAG program.  Section 1226 is a federal civil immigration requirement that has nothing to do with local criminal justice, or with any of the other purposes of the Byrne JAG program.

**C.     The Section 1231 (Notice) Requirement.**

75.     The Immigration-Related Certification appears to require local jurisdictions to make a certification related to 8 U.S.C. §1231(a)(4) ("Section 1231 Requirement").

76.     In the header to the Immigration-Related Certification, OJP states that it is a "Certification Relating to 8 U.S.C. §§ 1226(a) & (c), *1231(a)(4)*, 1324(a), 1357(a) & 1366(1) & (3)." Exh. 3.

77.     Furthermore, the Chief Legal Officer must certify that she or he has "carefully reviewed" Section 1231(a)(4) (*id.*), which provides that the federal government—specifically, the Attorney General—"may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment" (8 U.S.C. § 1231(a)(4)(A)).

78.     And in the body of the FY 2018 Local Solicitation, OJP refers to Section 1231 and states that grant recipients will be required to agree "[n]ot to impede the exercise of the authority of the federal government under . . . [Section 1226 and] 8 U.S.C. § 1231(a)(4) (relating to removal from the United States of aliens after detention/confinement at the federal, state, and local level), specifically by requiring such recipients to provide (where feasible) at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act."  FY 2018 Local Solicitation at 36-37 (attached as Exh. 2).

79.     But the Immigration-Related Certification contains no other substantive references to Section 1231.  The Immigration-Related Certification—as it appears in the Local Solicitation—does not require the Chief Legal Officer to certify that he or she has reviewed "any laws, rules, policies, or practices potentially applicable to the 'program or activity' sought to be funded under the FY 2018 OJP Program" that "implicate" Section 1231.  Exh. 3 (¶ 5).  Nor does the Certification require the Chief Legal Officer to certify that, as to the "program or activity" funded with Byrne JAG dollars, San

Francisco does not have in effect any law, policy, or practice that "would or does . . . impede the exercise by federal officers of . . . authority" relating to Section 1231.  *Id.* (¶ 6).

80.     Like the Section 1226 Requirement discussed above (*see* ¶¶ 63-76, *supra*), the Section 1231 Requirement appears to be nothing more than a repackaged version of the FY 2017 Notice Requirement.  And it fails for the same reasons.  *Id.*

**D.      The Section 1357 (Access) Requirement.**

81.     The Immigration-Related Certification also requires Byrne JAG recipients to make assurances "relating to" 8 U.S.C. § 1357(a).  It requires the Chief Legal Officer to certify that San Francisco has no policies or practices that would or do impede federal officers' exercise of authority relating to Section 1357.  Specifically, the City Attorney Herrera will have to certify:

a.      that he has conducted a "careful[] review[]" of Section 1357;

b.      that he has conducted (or caused to be conducted) a diligent inquiry and review of "the 'program or activity' to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2018 OJP Program" as well as "any laws, rules, policies, or practices . . . that implicate any of the requirements related to" Section 1357; and

c.      that, as to the "program or activity" funded with Byrne JAG dollars, San Francisco does not have in effect or purport to have in effect, and is not subject to or bound by, "any law, rule, policy, or practice . . . that would or does . . . impede the exercise by federal officers of authority under 8 U.S.C. § 1357(a)."  (Together, these are referred to in this Complaint as the "Section 1357 Requirement.")

82.     The Section 1357 Requirement appears to be nothing more than a repackaged version of the FY 2018 Access Requirement, which DOJ now—for the first time—attempts to connect directly to a statutory provision rather than to the general authority for "special conditions."

83.     Section 1357 provides, *inter alia*, that "[a]ny officer or employee of the [federal] Service . . . shall have power without warrant to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."  8 U.S.C. § 1357(a)(1); *see also* FY 2018 Local Solicitation at 50-51 (attached as Exh. 2).  DOJ appears to read this section in conjunction with 8 C.F.R. § 287.5(a)(1)—which states that an immigration officer can exercise this interrogation power

"anywhere in or outside the United States"—to mean that immigration officials have a right to interrogate anyone believed to be an alien any place and any time, without obtaining any form of warrant.  *See* FY 2018 Local Solicitation at 37 (attached as Exh. 2).

84.     Section 1357 does not impose *any obligations* at all on local governments.  Section 1357's terms apply solely to the federal government—specifically to federal immigration officers and federal immigration employees.

85.     Nonetheless, OJP attempts to use it as a hook to require state and local jurisdictions to permit personnel of the Department of Homeland Security to access any correctional or detention facility to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States.  As set forth in the body of the FY 2018 Local Solicitation, OJP takes the position that restricting immigration officials' access to suspected aliens in correctional facilities "impedes" federal officials' exercise of their duties under Section 1357.  *See* FY 2018 Local Solicitation at 37 (attached as Exh. 2).

86.     DOJ lacks the authority to impose the Section 1357 Requirement on Byrne JAG recipients.  Nothing in the Byrne JAG statute—or any other federal law—gives the Attorney General the authority to impose this condition.

87.     And again, the Section 1357 Requirement is ambiguous as to what jurisdictions must do to be in compliance.  Although OJP offers one example of what it might mean to "impede" federal officials in performing their Section 1357 duties, San Francisco has no way to know whether OJP might consider other practices to similarly "impede" the federal government.  This is particularly true given that OJP's example of what jurisdictions must do to avoid impeding federal immigration officers' performance of their Section 1357 duties is far afield from anything that a plain reading of the provision would require.

88.     Indeed, even the example OJP gives is itself ambiguous.  For instance, is San Francisco required to provide access to inmates in custody only when those inmates consent?  Or must the City compel unwilling inmates to meet with ICE representatives?  Does San Francisco have to allow ICE agents to use a jail interview room to "access" an uncooperative inmate when ICE wishes and for as long as its agents wish?  The Section 1357 Requirement does not answer these and similar questions.

89.     Also, the Section 1357 Requirement is not germane to the purposes of the Byrne JAG program.  Section 1357 is a federal civil immigration requirement that has nothing to do with local criminal justice, or with any of the other purposes of the Byrne JAG program.

**E.      The Section 1324 Requirement.**

90.     The Immigration-Related Certification requires Byrne JAG recipients to make assurances "relating to" 8 U.S.C. § 1324(a).  Specifically, the Immigration-Related Certification requires the Chief Legal Officer to certify that, as to the "program or activity" funded with Byrne JAG dollars, San Francisco does not have in effect or purport to have in effect, and is not subject to or bound by, "any law, rule, policy, or practice . . . that would or does . . . violate, or aid or abet any violation of, 8 U.S.C. § 1324(a) ("Section 1324 Requirement").  Exh. 3.

91.     Section 1324 forbids any "person," in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," to "conceal[], harbor[], or shield[] from detection or attempt[] to conceal, harbor, or shield from detection, such alien in any such place, including any building or any means of transportation" or to "engage in any conspiracy to commit any of the preceding acts . . . or aid[] or abet[] the commission of any of the preceding acts."  8 U.S.C. § 1324(a); *see also* FY 2018 Local Solicitation at 48-50 (attached as Exh. 2).

92.     DOJ lacks the statutory authority to impose the Section 1324 Requirement on Byrne JAG recipients.  Nothing in the Byrne JAG statute—nor any other federal law—gives the Attorney General the authority to impose this condition.

93.     Furthermore, the Section 1324 Requirement is ambiguous as to what jurisdictions must do to be in compliance.  OJP offers no guidance about what laws, policies, or practices might be deemed to violate, or aid and abet the violation of, Section 1324.  Beyond citing the statutory provision itself, OJP offers no guidance in the Local Solicitation about how local jurisdictions could run afoul of the Section 1324 Requirement.

94.     But elsewhere members of the Trump Administration have offered exceedingly broad interpretations of Section 1324—interpretations that could embrace any local policy that limits local enforcement of federal immigration laws.

95.     For instance, former ICE acting director Thomas Homan has stated on multiple

occasions that cities with sanctuary laws or policies are, or may be, violating Section 1324.

- In a July 27, 2017 interview regarding "sanctuaries," Homan suggested that sanctuary cities potentially violate Section 1324:  "I think these sanctuary cities need to make sure they're on the right side of the law.  They need to look at this.  Because I am."[16]

- In an August 2017 interview, Homan said: "And the third thing I talked to the attorney general today about was, you know, we need to look at these jurisdictions, are they crossing a legal line, are they committing a statutory crime by 8 U.S.C. 1324, alien smuggling?  There's a part of the law that says that if you harbor, conceal or shield, knowingly shield an illegal alien from law enforcement, that's a crime.  So I have asked the attorney general.  We need to look at this and find out, are these jurisdictions on the right side of that law?"[17]

- And as recently as January 2018, Homan suggested that jurisdictions violate Section 1324 simply by having policies that deny federal immigration officials access to inmates in jails.  Homan stated "we're going to enforce the law without apology.  What I'm also doing is working with the Department of Justice.  For these sanctuary cities that knowingly shield and harbor an illegal alien in their jail and don't allow us access, that is, in my opinion, a violation of 8 U.S.C. 1324.  That's an alien smuggling statute."[18]

96.     Similarly, the Secretary of Homeland Security, Kirstjen Nielsen, has stated that her

department has requested that DOJ "look into" whether elected officials in sanctuary jurisdictions are

---

[16] Stephen Dinan, *ICE Chief wants to Slap Smuggling Charges on Leaders of Sanctuary Cities,* The Washington Times (July 26, 2017) https://www.washingtontimes.com/news/2017/jul/26/thomas-homan-ice-chief-says-immigrant-sanctuaries-/.

[17] Interview by Trish Regan with U.S. Acting Immigration and Customs Enforcement Director Thomas Homan, *Acting ICE chief: Sanctuary cities put politics above safety,* Fox News (Aug. 16, 2017) http://www.foxnews.com/transcript/2017/08/16/acting-ice-chief-sanctuary-cities-put-politics-above-safety.html.

[18] Interview by Neil Cavuto with U.S. Acting ICE Director Thomas Homan, *Acting ICE director: California made a foolish decision,* Fox News (Jan. 2, 2018), http://www.foxnews.com/transcript/2018/01/02/acting-ice-director-california-made-a-foolish-decision.html.

violating Section 1324 and "review[] what avenues might be available" as part of their efforts to "find[] an efficient and effective way to enforce our immigration laws."[19]

97.    These comments suggest DOJ could embrace an expansive reading of Section 1324—a reading that would view every jurisdiction with any sanctuary law or policy as potentially violating Section 1324.[20]  This creates an ambiguity that makes it impossible for San Francisco—and other local jurisdictions, particularly those with sanctuary policies—to understand what is required to comply with the Section 1324 Requirement.

98.    As a result of this ambiguity, San Francisco and other local jurisdictions are left with no specific guidance on how to comply with the Section 1324 Requirement, and a generalized threat that their sanctuary laws and policies put them at risk not only for a loss of Byrne JAG funds, but also for criminal penalties.

99.    Also, the Section 1324 Requirement is not germane to the purposes of the Byrne JAG program.  Section 1324 is a portion of the federal immigration code that has nothing to do with local criminal justice, or any of the other purposes of the Byrne JAG program.

F.    **The Section 1366 Requirement.**

100.    Finally, the Immigration-Related Certification requires local jurisdictions to make assurances "relating to" 8 U.S.C. § 1366(1) & (3).  Specifically, the Immigration-Related Certification requires the Chief Legal Officer to certify that, as to the "program or activity" funded with Byrne JAG dollars, San Francisco does not have in effect or purport to have in effect, and is not subject to or bound by, "any law, rule, policy, or practice . . . that would or does . . . impede the exercise by federal officers of authority relating to 8 U.S.C. § 1366(1) & (3)" ("Section 1366 Requirement").  *See* Exh. 3.

---

[19] *Oversight of the United Stated Department of Homeland Security: Before the S. Comm. on the Judiciary*, 115th Cong. (Jan. 16, 2018), https://www.judiciary.senate.gov/meetings/oversight-of-the-united-states-department-of-homeland-security, at 4:02:51.

[20] San Francisco does not "harbor" criminals and its sanctuary city laws do not prevent federal authorities from taking custody of individuals with outstanding criminal warrants.  San Francisco law prohibits San Francisco law enforcement officials from detaining an individual who is otherwise eligible for release from custody on the basis of a civil immigration detainer request issued by the federal government.  A detainer request is distinct from a criminal warrant, which San Francisco honors consistent with its Sanctuary City Laws.  A detainer request is not issued by a judge based on a finding of probable cause.  It is simply a request by ICE that a state or local law enforcement agency hold individuals after their release date to provide ICE agents extra time to decide whether to take those individuals into federal custody and then deport them.

101.     Section 1366 requires the Attorney General to submit an annual report to the House and Senate Judiciary Committees detailing (1) "the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies," and (2) the "programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal."  8 U.S.C. § 1366(1) & (3); *see also* FY 2018 Local Solicitation at 51 (attached as Exh. 2).

102.     Again, Section 1366 does not impose *any obligations on local governments themselves*. Section 1366's terms apply solely to the federal government—specifically to the Attorney General himself.  It imposes a reporting requirement that *only* the Attorney General can perform.

103.     And OJP has given local jurisdictions *no guidance* about what it means to "impede" federal officials' exercise of authority relating to Section 1366.  While the body of the FY 2018 Local Solicitation discusses each other statutory provision (*see* FY 2018 Local Solicitation at 36-37 (attached as Exh. 2)), the FY 2018 Local Solicitation contains no other references to Section 1366 beyond those set forth in the Immigration-Related Certification.

104.     DOJ lacks the statutory authority to impose the Section 1366 Requirement on Byrne JAG recipients.  Nothing in the Byrne JAG statute—nor any other federal law—gives the Attorney General the authority to impose conditions of his choice.

105.     Furthermore, the Section 1366 Requirement is ambiguous as to what jurisdictions must do to be in compliance.  Again, OJP has given local jurisdictions no guidance about what types of local laws, policies, or practices impede the Attorney General in the exercise of his Section 1366 responsibilities.  Accordingly, local jurisdictions can only speculate about what local laws, policies, or practices the federal government may decide interfere with federal officers' conduct "relating to" their obligations under Section 1366.  And this speculation is made all the more difficult by the fact that Section 1366's text provides no role for local governments to play in the Attorney General's reporting obligations.

106.     Also, the Section 1366 Requirement is not germane to the purposes of the Byrne JAG program.  Section 1366 is a federal immigration reporting requirement that has nothing to do with local criminal justice, or any of the other purposes of the Byrne JAG program.

107.     Collectively, the Complaint refers to the Requirements set forth in the Immigration-Related Certification as the "Challenged FY 2018 Requirements."  *See* ¶¶ 63-106, *supra*.

**IV.     San Francisco Faces Immediate Injury From The Challenged FY 2018 Byrne JAG Requirements.**

**A.     San Francisco Cannot Certify Compliance With The Immigration-Related Requirements Without Changing Its Laws And Policies.**

108.     San Francisco is unable to execute the Immigration-Related Certification.  San Francisco's existing laws and policies prevent it from certifying that it complies with several of the new requirements that DOJ has imposed.  And as to others, the ambiguity regarding the meaning and scope of the requirements creates significant uncertainty for San Francisco—uncertainty that makes it impossible for San Francisco to execute the Immigration-Related Certification.

109.     The San Francisco Sheriff's Department has policies regarding access to jails for ICE officials enforcing the civil immigration laws.  Specifically, the Sheriff's Department policy prohibits Sheriff's Department employees from providing ICE agency representatives, or any other individual conducting civil immigration enforcement, access to inmates in jail, access to SFSD computers, databases and logs, release dates and times for inmates, and home or work contact information.[21]

110.     These policies make it difficult, if not impossible, for San Francisco to comply with the Section 1357 Requirement, which DOJ interprets to mandate that recipients permit DHS agents to have unfettered access to inmates in jails.  *See* ¶¶ 83-88, *supra*.

111.     Similarly, San Francisco has laws regarding City employees' authority to provide advance notification of an individual in custody's release date.  Specifically, Chapter 12I of San Francisco's Administrative Code—part of San Francisco's Sanctuary City laws—prohibits San Francisco law enforcement officials from responding to a federal immigration officer's request for advance notification of the date and time an individual in San Francisco's custody is being released, unless the individual in custody meets certain criteria.  *See* S.F. Admin. Code § 12I.3(c)-(d).

112.     This law make it difficult, if not impossible, for San Francisco to comply with the Section 1226 and Section 1231 Requirements, which DOJ interprets to require that recipients provide

---

[21] ICE requests for assistance with criminal investigations are directed to the Sheriff, who directs any assistance to ICE agents as she deems appropriate.

at least 48 hours' advance notice regarding the date and time an individual is scheduled to be released from the San Francisco's custody.  *See* ¶¶ 69-73, 78, *supra*.

113.    Also, ambiguity regarding the meaning and scope of the Section 1324 Requirement makes it difficult for San Francisco to certify that it complies with the Section 1324 Requirement.

114.    As described above (*see* ¶¶ 93-97, *supra*), the Trump Administration has interpreted Section 1324 broadly to mean that jurisdictions potentially violate Section 1324 simply by having sanctuary city laws or policies that limit cooperation with federal immigration authorities.

115.    San Francisco has such laws and policies that limit cooperation with federal immigration officials.  San Francisco has been a Sanctuary City since 1989, when it first enacted ordinances to protect Central American refugees who were escaping violent civil wars in their home countries and seeking legal protections in the United States.  In addition to the policies described above, San Francisco's current Sanctuary City Laws, codified in Chapters 12H and 12I of the San Francisco Administrative Code, continue to reflect San Francisco's broad dedication and commitment to promote public safety, public health, and community integrity.[22]

116.    In light of these laws and policies, the Trump Administration's statements regarding Section 1324 create a cloud of uncertainty for San Francisco.  San Francisco cannot sign the Immigration-Related Certification—particularly in light of the penalties that attach to that Certification (*see* Exh. 3 (explaining that a "materially false, fictitious, or fraudulent statement" in the certification will potentially subject the certifying Chief Legal Officer to criminal prosecution and the applicant entity to civil penalties and administrative remedies for false claims)—under that cloud of uncertainty.

---

[22] These laws serve important public purposes, as the legislative findings set forth in Chapter 12I confirm.  The Board of Supervisors has declared:

> Fostering a relationship of trust, respect, and open communication between City employees and City residents is essential to the City's core mission of ensuring public health, safety, and welfare, and serving the needs of everyone in the community, including immigrants.  The purpose of this Chapter 12I, as well as of Administrative Code Chapter 12H, is to foster respect and trust between law enforcement and residents, to protect limited local resources, to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all.

*See* Section 12I.2.

117.   Likewise, significant ambiguities prevent San Francisco from certifying that it complies with the Section 1366 Requirement.  DOJ has offered no guidance as to the meaning of that Requirement.  *See* ¶ 103, *supra*.  As a result, San Francisco cannot certify that it complies with that Requirement, as it has no way to know what the Requirement demands of it.

**B.    The Challenged FY 2018 Requirements Put San Francisco To An Unconstitutional Choice.**

118.   The Challenged FY 2018 Requirements create an untenable choice for San Francisco, when it is faced with the decision whether to accept the FY 2018 Byrne JAG award.  San Francisco must choose between amending its laws and policies to allow it to execute the Immigration-Related Certification, or forgoing hundreds of thousands of dollars in important criminal justice funding.

119.   As described above, San Francisco cannot sign the Immigration-Related Certification in light of various ambiguities and potential conflicts with San Francisco's laws and policies.  If San Francisco maintains those laws and policies and declines to execute the Immigration-Related Certification, it will have to forgo direct FY 2018 Byrne JAG funding.  This is because recipients are required to certify that they comply with all applicable award conditions and execute all necessary certifications in order to accept a FY 2018 Byrne JAG award.[23]

120.   San Francisco will also have to forgo the pass-through grant it expects to receive from the State of California.

121.   On information and belief, the State of California has applied for FY 2018 Byrne JAG funds, or will do so in the near future.  Once the State of California receives Byrne JAG funds, it issues a request for proposals ("RFP") for local jurisdictions to apply for pass-through funds.  San Francisco has applied for, and received, pass-through Byrne JAG funds in the past pursuant to this RFP process.  But to receive pass-through Byrne JAG funds, San Francisco would be required to submit assurances that it will comply with all award requirements.

122.   The loss of this funding will have significant negative impacts on San Francisco.  The variety of programs that Byrne JAG funding supports will be placed in jeopardy.  San Francisco could

---

[23] When it submitted its application for FY 2018 Byrne JAG funding, San Francisco included a reservation of rights regarding the Challenged FY 2018 Requirements.  San Francisco made clear that it was not certifying that it would comply with the Challenged FY 2018 Requirements, and stated that it was planning to challenge those requirements in litigation.

1  be forced to reduce or eliminate these programs, and the staff positions they support, unless additional

2  funding sources could be identified.

3      123.     Alternatively, San Francisco could change its local laws and policies to attempt to

4  comply with the Challenged FY 2018 Requirements—a difficult endeavor given the significant

5  ambiguities about the scope and meaning of many of those Requirements.

6      124.     More significantly, changing its local laws and policies would also harm San Francisco

7  by forcing it to abandon its considered and constitutionally protected policy judgments.  San

8  Francisco's Sanctuary City laws and policies reflect lawmakers' considered judgment that public

9  safety, public health, and community cohesion are best served by limiting local employees'

10 entanglement with federal immigration priorities to the extent possible under federal law.  By

11 threatening to withhold funds, DOJ seeks to intrude on San Francisco's sovereign authority to make

12 such policy choices.

13                **COUNT ONE:  SEPARATION OF POWERS**

14      125.     Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as

15 if fully set forth herein.

16      126.     In July 2018, Defendants issued a solicitation seeking applications for the FY 2018

17 Byrne JAG program.

18      127.     San Francisco has applied for the FY 2018 Byrne JAG program.

19      128.     The FY 2018 Local Solicitation makes clear that jurisdictions wishing to accept 2018

20 Byrne JAG funds will have to execute a "Certification Relating to 8 U.S.C. §§ 1226(a) & (c),

21 1231(a)(4), 1324(a), 1357(a), & 1366(1) & (3)."  This Certification imposes the Challenged FY 2018

22 Requirements.

23 //

24 //

25      129.     The Constitution vests Congress with legislative powers, *see* U.S. Const. art. 1, § 1, and

26 the spending power, *see* U.S. Const. art. 1, § 8, cl. 1.  Absent a statutory provision or an express

27 delegation, only Congress is entitled to attach conditions to federal funds.

28

130.    Congress has not enacted the Challenged FY 2018 Requirements as part of any statutory scheme.

131.    Congress has not enacted the Challenged FY 2018 Requirements as applicable to Byrne JAG funds.

132.    Congress has not delegated to Defendants the authority to impose the Challenged FY 2018 Requirements on Byrne JAG funds.

133.    Defendants are unilaterally imposing the Challenged FY 2018 Requirements without authorization from Congress.

134.    For these reasons, DOJ in imposing the Challenged FY 2018 Requirements unconstitutionally intrudes upon and usurps powers that belong to Congress, violating principles of separation of powers.

## COUNT TWO:  SPENDING CLAUSE

135.    Plaintiff repeats and incorporates by reference each allegation of the prior paragraphs as if fully set forth herein.

136.    As described above, the Challenged FY 2018 Requirements violate separation of powers principles because they are not authorized by Congress, expressly or impliedly.

137.    Even if Congress had delegated its authority to impose conditions on Byrne JAG funds, the Challenged FY 2018 Requirements would violate the Spending Clause by:

a.    imposing conditions that are ambiguous, *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts [Congress' conditions]…  There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it…  [I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." ); and

b.    imposing conditions that are not germane to the stated purposes of the Byrne JAG funds, *see South Dakota v. Dole*, 483 U.S. 203, 207 (1987) ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PRAYER FOR RELIEF**

Wherefore, San Francisco prays that the Court grant the following relief:

1.      Declare the Challenged FY 2018 Requirements Defendants have imposed on the Byrne JAG program unconstitutional;

2.      Permanently enjoin Defendants from using the Challenged FY 2018 Requirements as funding restrictions for any Byrne JAG awards, now or in the future;

3.      Award San Francisco reasonable costs and attorneys' fees; and

4.      Grant any other further relief that the Court deems fit and proper.


Dated:   August 22, 2018

DENNIS J. HERRERA
City Attorney
JESSE C. SMITH
RONALD P. FLYNN
YVONNE R. MERÉ
TARA M. STEELEY
SARA J. EISENBERG
AILEEN M. McGRATH
Deputy City Attorneys


By: */s/ Dennis J. Herrera*
DENNIS J. HERRERA
City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO