UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>Plaintiff,<br><br>v.<br><br>JEFFERSON B. SESSIONS, et al.,<br><br>Defendants. | Case No. 18-cv-05146-WHO<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR PARTIAL DISMISSAL OR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 27, 30 |
| STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>JEFFERSON B. SESSIONS, et al.,<br><br>Defendants. | Case No. 18-cv-05169-WHO<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR PARTIAL DISMISSAL OR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 25, 29 |

**INTRODUCTION**

Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program funds have been the focal point of an ongoing dispute between the federal, state, and local governments for the past two years. After President Trump assumed office, he issued an Executive Order announcing a policy of withholding federal grants from "sanctuary jurisdictions," which was challenged by the City and County of San Francisco and the County of Santa Clara. I granted summary judgment to prevent the Executive Order from being enforced; the Ninth Circuit affirmed. C*ity and Cty. of San Francisco v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom. City and Cty. of San Francisco v. Trump*, 897 F.3d

1225 (9th Cir. 2018).

Shortly thereafter, former Attorney General Jefferson Beauregard Sessions III imposed three new conditions on the receipt of Byrne JAG funding for fiscal year 2017: the access, notice, and Section 1373 certification conditions. These conditions required Byrne JAG applicants to provide Immigration and Customs Enforcement ("ICE") with "access" to correctional facilities for immigration enforcement purposes, "notice" of detainee release dates, and to certify compliance with 8 U.S.C. § 1373. California and San Francisco sued the DOJ for withholding their fiscal year 2017 grant funds after they asserted compliance with the new conditions. I found that the challenged conditions were unlawful on multiple grounds and held that Section 1373 was unconstitutional. *City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 934 (N.D. Cal. 2018), *judgment entered sub nom. California ex rel. Becerra v. Sessions*, No. 3:17-CV-04701-WHO, 2018 WL 6069940 (N.D. Cal. Nov. 20, 2018).

For fiscal year 2018, defendants Acting Attorney General Matthew G. Whitaker and the Department of Justice (collectively, the "DOJ") continued to include essentially the same fiscal year 2017 challenged conditions as well as two other new conditions. The additional 2018 conditions require Byrne JAG recipients: (i) not to publicly disclose sensitive federal law enforcement information in an attempt to harbor or shield "fugitives from justice" or "aliens" in violation of federal immigration law (the "nondisclosure condition"); and (ii) to provide information about the applicant's laws and policies for purposes of assessing compliance with Section 1373 (the "information condition").

California and San Francisco have sued the DOJ challenging five conditions in the fiscal year 2018 Byrne JAG Program. The DOJ filed a partial motion to dismiss or a partial motion for summary judgment, seeking dismissal or judgment on California's and San Francisco's claims regarding the nondisclosure and information conditions. The DOJ has preserved its arguments on the access, notice, and certification conditions from the prior case on fiscal year 2017 funds, which apply to some of the fiscal year 2018 Byrne JAG funding.

California and San Francisco responded with their own motions for summary judgment. They seek declaratory relief that the challenged conditions are unconstitutional violations of the

2

separation of powers and the Spending Clause of the United States Constitution and to enjoin the DOJ from enforcing the challenged conditions or withholding Byrne JAG funds based on those requirements.  California also brings an Administrative Procedure Act claim and seeks mandamus relief compelling the DOJ to issue California its fiscal year 2018 Byrne JAG awards without the challenged conditions.

Only the nondisclosure condition raises a substantive concern that I have not addressed, and it fails for somewhat different reasons than the other conditions.  Left to its core—that local jurisdictions should not publicize confidential federal law enforcement actions that are disclosed to local authorities to insure deconfliction and protect local law enforcement and residents—seems self-evident and reasonable.  But DOJ did not leave it to its core, and instead larded it with broad-ranging, ambiguous language that would allow DOJ the discretion to coerce local jurisdictions to comply with its interpretation of the statutes in dispute in these cases.  The exercise of such discretion is all the more suspect in light of the active litigation over immigration issues between California jurisdictions and the federal government, and the threat made by Administration officials to commence criminal prosecution of California officials who follow that sovereign's interpretation of the law.  *See, e.g.*, CA Request for Judicial Notice ("RJN"), Ex. F (DHS Secretary Nielsen confirming to the Senate Judiciary Committee that DOJ was "reviewing what avenues might be available" to bring criminal charges against elected officials abiding by sanctuary policies.).

Accordingly, for the reasons discussed more fully below, I find that (i) the challenged conditions are ultra vires and violate the separation of powers, (ii) Section 1373 is unconstitutional, (iii) the Attorney General exceeds the Spending Clause in violation of the United States Constitution by imposing ambiguous challenged conditions in the fiscal year 2018 Byrne JAG Program, (iv) the conditions are arbitrary and capricious, (v) California is entitled to the mandamus relief it seeks, and (vi) a nationwide injunction is warranted but stayed.  California's and San Francisco's motions for summary judgment are granted, and the DOJ's motions are denied.

**BACKGROUND**

**I.      FACTUAL BACKGROUND**

**A.      The Immigration and Nationality Act**

Congress reinforced the Executive Branch's inherent authority "over the subject of immigration and the status of aliens" when it passed the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq. Arizona v. United States*, 567 U.S. 387, 394 (2012). The INA authorizes the Department of Homeland Security ("DHS") as well as the DOJ and other federal agencies to enforce the immigration laws. *See, e.g.*, 8 U.S.C. § 1227(a)(2) (allowing the Attorney General or Secretary of Homeland Security to order removal of certain classes of immigrants). It also contemplates coordination between federal officials and state or local jurisdictions. *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). Various provisions seek to accomplish such coordination and information sharing when possible. *See* 8 U.S.C. § 1252c (authorizing state and local officers to make arrests for unlawful reentry); 8 U.S.C. § 1324(c) (authorizing state and local officers to make arrests for INA violations); 8 U.S.C. § 1357(g) (authorizing state and local officers to perform functions of a federal immigration officer).

**B.      The Byrne JAG Program**

The Byrne JAG program is a formula grant program that is administered by the Bureau of Justice Assistance, a department within the Office of Justice Programs ("OJP"). *See* 34 U.S.C. § 10156(d)(2)(A) (stating that "the Attorney General shall allocate to each unit of local government" funds determined by the established formula). Grant funding is awarded as a function of population and violent crime rate. *See* 34 U.S.C. § 10156(a). Eligible grantees are entitled to their awards so long as their Byrne JAG funds go toward programs in one of eight program areas: (1) law enforcement, (2) prosecution and court, (3) prevention and education, (4) corrections and community corrections, (5) drug treatment and enforcement, (6) planning, evaluation, and technology improvement, (7) crime victim and witness programs, and (8) mental health programs. *See* 34 U.S.C. § 10152(a)(1)(A)–(H).

Under the formula, California is expected to receive $28.9 million Byrne JAG funds in

fiscal year 2018, including $18 million going to the Board of State and Community Corrections

("BSCC"). Jolls Decl. ¶ 5. The BSCC plans to continue using the funds for education and crime

prevention, law enforcement, and court programs, as it has in previous years. *Id.* ¶¶ 9–10

(detailing the types of sub-grants that BSCC has provided in previous years, and the focus on

education and crime prevention programs for the next three-year grant cycle).

San Francisco is expected to receive $489,966 in direct Byrne JAG funding and

approximately $1 million in state sub-grant funding under the formula. Chyi Decl. ¶ 8, Ex. C.

San Francisco uses the funding to support law enforcement programs aimed at reducing the drug

trade and recidivism among repeat offenders, and for programs connecting those with substance

and mental health problems to appropriate services. *Id.* ¶¶ 10–11, 17. As in fiscal year 2017, San

Francisco faces the prospect of eliminating approximately ten full-time positions spanning six

departments without Byrne JAG funding. *Id.* ¶¶ 10–19; *see also City & Cty. of San Francisco*,

349 F. Supp. 3d at 936 (discussing San Francisco's intended uses for JAG funds).

California and San Francisco received their fiscal year 2018 Byrne JAG award documents

on November 16, 2018. *See* DOJ RJN Exs. C, D.[1] Because the award documents contained the

challenged conditions at issue in this litigation, California and San Francisco requested and

received an extension from the DOJ to accept the awards until 30 days after a Judgment is entered

in their respective cases. Chyi Decl. ¶ 15–16; Sherman Decl. at Ex. 7.

**C.      Fiscal Year 2017 Byrne JAG Program Conditions and Related Litigation**

In 2016, the DOJ announced that Section 1373 would be an "applicable law" for the Byrne

JAG Program. *See* Admin. Record ("AR")-384 (SF Dkt. No. 26; CA Dkt. No. 24). For the

following fiscal year (2017), the Byrne JAG Solicitation formalized the announcement, requiring a

---

[1] The parties requested judicial notice of various public records, government documents, or court filings, whose accuracy and authenticity are not disputed. Government records such as letters, memos, bulletins, or other reports or statements of public record are judicially noticeable. S*ee, e.g., Brown v. Valoff*, 422 F.3d 926, 933 n.9 (9th Cir. 2005) (taking judicial notice of government administrative bulletin); Fed. R. Evid. 201(b). Court records from other proceedings are also susceptible to judicial notice if relevant to this litigation. *See U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (holding that a court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"). Thus, the requests for judicial notice are GRANTED. *See* SF Dkt. Nos. 27-1, 31, 57; CA Dkt. Nos. 25-1, 29-2, 41-1, 45.

United States District Court
Northern District of California

1  certification of compliance with Section 1373.  AR-994, 1032-33.  The DOJ additionally required

2  Byrne JAG funding recipients to have policies allowing federal agents "access" to any state or

3  local government correctional facility, and to provide "notice" of scheduled release dates for non-

4  citizens in those facilities.  AR-1687–88.

5       I found, along with every court to hear challenges to the fiscal year 2017 Byrne JAG

6  conditions, that these conditions were unlawful.  *See City & Cty. of San Francisco*, 349 F. Supp.

7  3d at 940–41 (summarizing related litigation at the time concerning the fiscal year 2017 Byrne

8  JAG conditions); *see also City of Chicago v. Sessions*, 888 F.3d 272, 293 (7th Cir. 2018)

9  (invalidating notice and access conditions); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289

10  (E.D. Pa. 2018) (invalidating the notice, access, and Section 1373 certification condition).

11       Since then, the Third Circuit has affirmed in part the *City of Philadelphia* decision.  *City of

12  Philadelphia v. Attorney Gen. of United States of Am.*, No. 18-2648, 2019 WL 638931 (3d Cir.

13  Feb. 15, 2019).  The court found that no authority was conferred to the DOJ by Congress via the

14  Byrne JAG statute itself or other statutes at issue here such as Section 10102 or Section

15  10153(a)(5)(D).  *Id*. at *10.  Several more courts also found the 2017 challenged conditions

16  unlawful.  In *States of New York, et al. v. Dep't of Justice*, 343 F. Supp. 3d 213 (S.D.N.Y. 2018),

17  the court granted plaintiffs' motion for partial summary judgment.  It found the 2017 conditions

18  were ultra vires under the Administrative Procedure Act ("APA"), *id*. at 231, Section 1373 was

19  unconstitutional under the anticommandeering doctrine of the Tenth Amendment, *id*. at 237, the

20  conditions violated the separation of powers, *id*. at 238, and the conditions were arbitrary and

21  capricious under the APA, *id*. at 241.  Similarly, in *Los Angeles v. Sessions*, No. 17-cv-7215 (C.D.

22  Cal. Sept. 13, 2018) (Dkt. No. 93) the court granted plaintiff's motion for preliminary injunction

23  of the 2017 challenged conditions.  It found that 34 U.S.C. § 10153(a), the provision providing the

24  Attorney General with authority over the "form" of the application, did not indicate authority to

25  add civil immigration conditions.  *Id*. at 3.

26       In *City of Los Angeles v. Sessions*, No. 18-cv-7347 (C.D. Cal. Feb. 15, 2019), the district

27  court addressed the same fiscal year 2018 Byrne JAG conditions at issue here and granted

28  plaintiff's motion for summary judgment while denying defendant's motion for partial dismissal

or partial summary judgment. *See* Joint Supp. RJN, Ex. A. It found no authority conferred by Section 10153(a)(5)(D) to support the nondisclosure condition, and it found that the information condition exceeded the "programmatic and financial information" that the Attorney General was otherwise authorized to require of state and local governments. *Id*. at 7–8. Lastly, the court granted a program-wide injunction and permanently enjoined the defendants from imposing the challenged conditions in fiscal year 2018 Byrne JAG awards. *Id*. at 10.

### D. Challenged Conditions in the Fiscal Year 2018 Byrne JAG Program

The DOJ continued to utilize requirements that are functionally equivalent to the three challenged conditions in the prior fiscal year 2017 JAG Solicitation and added two new conditions in fiscal year 2018. California and San Francisco challenge each of these five conditions in the 2018 Byrne JAG Solicitation. *See* SF First Amended Compl. ("FAC") (Dkt. No. 22); CA FAC (Dkt. No. 20). The DOJ moves for partial dismissal or summary judgment on the two new conditions.

The 2018 Solicitation requires California and San Francisco, through their chief legal officer, to continue to certify compliance with Section 1373. It modifies this requirement somewhat by also requiring certification of compliance with 8 U.S.C. § 1644. *See* DOJ RJN Ex. D ¶¶ 41–43. Section 1644 contains nearly identical language as Section 1373 and prohibits restrictions on communicating immigration information. AR-1258, 1264.

The 2018 Solicitation also requires the chief legal officer to certify that the applying jurisdiction will not interfere with law enforcement in their access to correctional facilities or in the removal process by failing to provide notice of scheduled release dates and times. *See* DOJ RJN Ex. D ¶¶ 45–46. Put another way, the Solicitation requires the applicant not to have laws, policies, or practices that "impede" federal officers from exercising their authority under 8 U.S.C. § 1357(a) and which impede their authority "relating to" 8 U.S.C. §§ 1226(a), 1226(c), 1231(a)(4), 1366(1), and 1366(3). AR-1233, 1241–42, 1250, 1260, 1268. Section 1357(a) describes immigration officer authority to "interrogate any alien," "arrest any alien," or exercise other proscribed powers without a warrant. 8 U.S.C. § 1357(a). Additionally, Sections 1226, 1231, and 1366 involve immigration officer powers to make arrests, detain, and release undocumented

persons, and to make annual reports on certain "criminal alien" statistics.

The nondisclosure and the information conditions appear for the first time in the fiscal year 2018 Byrne JAG funding conditions. The nondisclosure condition provides that:

> Consistent with the purposes and objectives of federal law enforcement statutes and federal criminal law (including 8 U.S.C. 1324 and 18 U.S.C. chs. 1, 49, 227), no public disclosure may be made of any federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice under 18 U.S.C. ch. 49, or any alien who has come to, entered, or remains in the United States in violation of 8 U.S.C. ch. 12 – without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. 1071 or 1072 or of 8 U.S.C. 1324(a).

*See* DOJ RJN Ex. D ¶ 44.

The information condition, which the DOJ disputes is a condition in the first instance, requires award recipients to collect certain information from sub-grant recipients. *Id.*, Ex. D ¶ 47. For example, California would not be able to authorize a sub-grant "unless it first obtains from the proposed subrecipient responses to the questions identified in the program solicitation as 'Information regarding Communication with the Department of Homeland Security (DHS) and/or Immigration and Customs Enforcement (ICE)." *Id.* Those questions include whether the jurisdiction has "any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE," and require applicants to provide a copy of the law or policy, describe the practices, and explain how it complies with Section 1373. *See* FAC at 52 (SF Dkt. No. 22-2; CA Dkt. No. 20-1).

### E.     California and San Francisco's Laws and Policies

The plaintiffs' asserted interests implicated by the Byrne JAG Program challenged conditions have been discussed thoroughly in the prior litigation of the fiscal year 2017 conditions. *See City & Cty. of San Francisco*, 349 F. Supp. 3d at 937–40 (summarizing California and San Francisco laws and policies relevant to the 2017 conditions). The California Legislature sought, in its laws and policies, to use its "limited resources for public safety rather than immigration enforcement" after concluding that limited involvement with immigration enforcement resulted in safer communities. *Id.* at 938 (citing Cal. Gov. Code § 7284.2(f)). It also based policies on local law enforcement's belief in the importance of maintaining trust with immigrant communities. *Id.*

San Francisco agreed, providing its own evidence in support of the importance that trust holds for "greater reporting of crimes, more cooperative witnesses, and more assistance with law enforcement investigations." *Id*. at 941.

## II.      PROCEDURAL BACKGROUND

In August 2018, California and San Francisco filed lawsuits challenging the DOJ's imposition of the five challenged conditions on Byrne JAG funding in fiscal year 2018. *See* Complaint (SF Dkt. No. 1; CA Dkt. No. 1). The plaintiffs filed their first amended complaints in November 2018, and the DOJ filed a motion for partial dismissal or partial summary judgment in December. *See* DOJ Partial Mot. to Dismiss or Summ. J. (SF Dkt. No. 27; CA Dkt. No. 25). In response, California and San Francisco filed motions for summary judgment. *See* Mots. For Summ. J. (SF Dkt. No. 30; CA Dkt. No. 29). Amici have also filed briefs in both matters.[2]

## LEGAL STANDARD

## I.       MOTIONS TO DISMISS

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570. There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*.

To decide if the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

---

[2] There are two motions for leave to file amicus briefs. *See* Admin. Mots. for Leave (SF Dkt. No. 54; CA Dkt. No. 38). Because each motion complies with my prior Order Regarding Amicus Briefing, they are GRANTED.

fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses a complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## II.      MOTIONS FOR SUMMARY JUDGMENT

A party is entitled to summary judgment where it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To prevail, a party moving for summary judgment must show the lack of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. S*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id*. The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id*. at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

## I. BYRNE JAG CONDITIONS RESEMBLING THE 2017 CONDITIONS

As an initial matter, the parties have agreed to incorporate by reference arguments and supporting documents that they presented in the related 2017 Byrne JAG litigation to preserve their arguments for appeal. *See* Minute Order (SF Dkt. No. 25; CA Dkt. No. 23); *City & Cty. of San Francisco*, 349 F. Supp. 3d 924. There is no dispute that certain challenged conditions in the fiscal year 2018 Byrne JAG Program are functionally the same as the notice, access, and Section 1373 certification conditions in the fiscal year 2017 Byrne JAG program at issue in the previous related litigation. *See* SF RJN Ex. B at 36–37, 43 (stating the conditions); Ex. C at 3–4 (summarizing conditions, including "interview" and "custody" conditions on fiscal year 2018 Byrne JAG requirements resembling the notice and access conditions); *City of Los Angeles*, No. 18-cv-7347 (C.D. Cal. Feb. 15, 2019)("the substance and effect of the conditions remains the same" even after minor changes were made from 2017), Joint Supp. RJN, Ex. A at 5. Even though the conditions remain in the 2018 Solicitation, the parties also do not dispute that the DOJ is not enforcing them—at least while the matter is pending in the Ninth Circuit.

As the notice, access, and Section 1373/1644 certification conditions remain essentially the same, my conclusions on those conditions still hold and I incorporate it by reference. The 2018 notice, access, and Section 1373/1644 certification conditions "violate the separation of powers; Section 1373 is unconstitutional; the Attorney General exceeds the Spending Power in violation of the United States Constitution" by imposing the Section 1373/1644 certification condition and access and notice conditions; and "the challenged conditions are arbitrary and capricious." *City & Cty. of San Francisco*, 349 F. Supp. 3d at 934.

The remaining analysis in this Order focuses on the nondisclosure and information conditions, the challenged conditions in the 2018 Byrne JAG award and Solicitation that were not present in 2017.

## II. THE SEPARATION OF POWERS

The DOJ argues that the nondisclosure and information conditions are authorized by three statutory provisions that are permissible under the separation of powers. Specifically, it cites

34 U.S.C. § 10153(a)(5)(D) and 34 U.S.C. §§ 10102(a)(2) and (a)(6), asserts that the authority applies to the Byrne JAG program, and contends that the statutes exhibit congressional intent to allow the Assistant Attorney General ("AAG") of the Office of Justice Programs to exercise discretion over formula grants.

Congress may, consistent with the separation of powers, delegate certain authority to spend money to the Executive Branch. *See Clinton v. City of N.Y.*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money.") (Breyer, J. dissenting). The Constitution gives an "unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process." *I.N.S. v. Chadha*, 462 U.S. 919, 959 (1983).

Sections 10102(a)(2) and (6) state:

> The Assistant Attorney General shall… (2) maintain liaison with...State governments in matters relating to criminal justice; [and]… (6) exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants.

> 34 U.S.C. § 10102.

Section 10153 reads in part:

> (a) To request a grant under this part, the chief executive officer of a State or unit of local government shall submit an application to the Attorney General within 120 days after the date on which funds to carry out this part are appropriated for a fiscal year, in such form as the Attorney General may require.
> …
> (5) A certification, made in a form acceptable to the Attorney General and executed by the chief executive officer of the applicant (or by another officer of the applicant, if qualified under regulations promulgated by the Attorney General), that
> …
> (D) the applicant will comply with all provisions of this part and all other applicable Federal laws.

> 34 U.S.C. § 10153.

None of these statutory authorities grants the DOJ power to impose the fiscal year 2018 Byrne JAG challenged conditions, as discussed further below.

**A.     Section 10102 Does Not Grant Authority to Impose the Fiscal Year 2018 Byrne JAG Challenged Conditions**

The DOJ relies on Section 10102 for independent authority to impose the nondisclosure and information conditions.  It makes similar arguments in favor of the new fiscal year 2018 conditions that it made in the litigation over the 2017 conditions.  In particular, it contends that Section 10102(a)(6) grants it authority because the amendment of the Reauthorization Act, creating the Byrne JAG Program in 2006 inserted "including placing special conditions on all grants, and determining priority purposes for formula grants."  Pub. L. No. 109-162, § 1152(b), 119 Stat. at 3113; 34 U.S.C. § 10102(a)(6).  The DOJ contends that giving the amendment no practical effect would contravene the "well-known canon of statutory construction that, in general, a statute should not be construed so as to render a word or clause inoperative."  *Bell v. Reno*, 218 F.3d 86, 91 (2d Cir. 2000); *see, e.g., Johnson v. Consumerinfo.com, Inc.*, 745 F.3d 1019, 1022 (9th Cir. 2014) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.") (citation omitted).

The DOJ noted its disagreement with my prior Order in the related litigation, but has not shown why the legal reasoning concerning the fiscal year 2017 conditions does not apply with equal force in 2018.  In *City of Chicago v. Sessions*, 888 F.3d 272, 284–85 (7th Cir. 2018), and *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 616–17 (E.D. Pa. 2017), the courts found that the DOJ's interpretation of Section 10102(a)(6) was contrary to the plain meaning of the statute.  I agreed with *City of Chicago* and *City of Philadelphia* in the prior related litigation.  *See City & Cty. of San Francisco*, 349 F. Supp. 3d at 947–48.  Since then, the Third Circuit and the Hon. Egardo Ramos of the United States District Court for the Southern District of New York have also rejected the DOJ's interpretation of Section 10102(a)(6).  *See City of Philadelphia*, 2019 WL 638931, at *8; *States of New York, et al. v. Dep't of Justice*, 343 F. Supp. 3d 213 (S.D.N.Y. 2018).

Section 10102(a)(6)'s language allowing the Attorney General to place "special conditions on all grants" and to determine "priority purposes for formula grants" depends on the authority "vested in the Assistant Attorney General pursuant to this chapter…" 34 U.S.C. § 10102.  As I found in the related litigation, "[n]o portion of the same chapter authorizes the conditions

13

explicitly," the Attorney General does not have the power to impose the conditions independent of Congress, and the Byrne JAG statute does not reference Section 10102. *City & Cty. of San Francisco*, 349 F. Supp. 3d at 948.

Section 10102(a)(6)'s statutory structure does not support the DOJ's interpretation of its broad independent authority either. As the court discussed in *City of Chicago*, 888 F.3d at 285, the final "catch-all provision at the end of a list of explicit powers would be an odd place indeed to put a sweeping power to impose any conditions on any grants…" This is still true.

### 1. The duty to maintain liaison under Section 10102(a)(2)

Related to the power to place "special conditions," however, the DOJ relies on a provision stated earlier in the list of its "Duties and Functions of the Assistant Attorney General." 34 U.S.C. § 10102. The DOJ asserts that under Section 10102(a)(2), the AAG's duty to "maintain liaison" with California and San Francisco in matters related to criminal justice authorizes it to impose the nondisclosure and information conditions.[3] It contends that the nondisclosure condition is justified by the need to keep law enforcement officers safe and their operations confidential while working with state and local law enforcement, and that the information condition was intended to clarify that applicants can abide by other conditions and maintain liaison with DOJ. It interprets Section 10102(a)(2) as permitting it to (i) protect the confidentiality of federal law enforcement information provided to state and local agencies, and (ii) assess the ability of those agencies to engage in cooperation by gathering information about their laws and policies. *See Eringer v. Principality of Monaco*, No. CV 10-1803 GAF (EX), 2011 WL 13134271, at *5 (C.D. Cal. Aug. 23, 2011), *aff'd*, 533 F. App'x 703 (9th Cir. 2013) (stating that plaintiff's duty to "maintain liaison" between two agencies entailed "regularly shar[ing] sensitive intelligence information.").

An agency lacks power to act "unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). In the grant context, the power to place conditions on grants depends on "whether Congress conferred authority on the Attorney General

---

[3] Previously, the DOJ relied on Section 10102(a)(2) to argue that its 2017 conditions comport with the Spending Power and were related to the criminal justice purposes of the Byrne JAG Program. I found that the challenged conditions, premised on the authority of Section 10102(a)(2), were unrelated. *See City & Cty. of San Francisco*, 349 F. Supp. 3d at 958–59.

14

1 to impose them." *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 940 (N.D. Ill. 2017). The

2 DOJ puts far more weight on "maintain liaison" than it can hold.

3     As discussed above, the plain text of Section 10102 grants the AAG "power to place

4 special conditions on grants only to the extent that such power has been vested in him or her

5 'pursuant to this chapter or by delegation of the Attorney General." *City of Philadelphia*, 2019

6 WL 638931, at *7.[4] The text of the "maintain liaison" authority on which the DOJ relies states

7 only that "[t]he Assistant Attorney General shall… (2) maintain liaison with...State governments

8 in matters relating to criminal justice." 34 U.S.C. § 10102. This provision does not support a

9 broad authority to place the challenged conditions on Byrne JAG grantees. California and San

10 Francisco argue that this statutory provision was not intended as empowering the DOJ to impose

11 conditions, and instead was an instruction for the AAG to maintain bilateral communications or

12 act as a point of contact with state and local governments.

13     The DOJ does not identify where in the statutory text Congress expressed its intent for

14 maintaining liaison to amount to discretionary authority for creating conditions on state and local

15 governments in the Byrne JAG Program. Instead, it merely defines "liaison" itself. *See* DOJ

16 Oppo./Reply at 3 (citing Liaison, Merriam-Webster, https://www.merriam-

17 webster.com/dictionary/liaison (last visited Jan. 15, 2019) (defining liaison as "a close bond or

18 connection" or "a person who establishes and maintains communication for mutual understanding

19 and cooperation."). It is too great a leap to conclude that because Congress imposed an obligation

20 on the DOJ to "maintain liaison," or maintain a close connection to "Federal and State

21 governments in matters relating to criminal justice," that it was intending to grant the DOJ broad

22 authority to impose the challenged conditions over states and local governments receiving funds.

23 34 U.S.C. § 10102(a)(2).

24     The structure of Section 10102 does not support the contention that "maintain liaison" in

25

26 [4] This is consistent with the findings of every other court to hear this argument on Section
10102(a)(6). *See, e.g.*, *City of Chicago*, 888 F.3d at 285 (finding the term "including" limited
27 authority to placing conditions vested in the Attorney General in the same chapter or delegated to
him or her elsewhere); *States of New York et al.*, 343 F. Supp. 3d at 228 (same); *City & Cty. of San*
28 *Francisco*, 349 F. Supp. 3d at 948 (same).

Section 10102(a)(2) provides more than a ministerial duty on the Attorney General to maintain communication with other Federal and State agencies. As the Third Circuit recently stated, "a word is known by the company it keeps." *City of Philadelphia*, 2019 WL 638931, at *8. The six powers of the AAG in this section "all deal with the AAG's power to disseminate criminal justice information and coordinate with various agencies and officials." *Id*. The Seventh Circuit agrees with this interpretation. *See City of Chicago*, 888 F.3d at 285 ("The preceding 'powers' in the list, §§ 10102(a)(1)–(5), address the communication and coordination duties of the Assistant Attorney General.").

On the other hand, the nondisclosure condition is more than ministerial. It requires grantees to internally enforce against "direct or indirect attempts" to disclose information, and it empowers the AAG to be the sole arbiter of what it considers to be a violation of the condition.

Further, there is no indication that the "maintain liaison" duty in "matters relating to criminal justice" conferred a power to place conditions pertaining to immigration enforcement at all. *Id*. The information condition is squarely focused on immigration enforcement, and at most superficially touches on the liaison relationship. The information condition may help determine if grantees can maintain liaison, as the DOJ argued at the hearing, but it was also intended to confirm compliance with conditions like the Section 1373 certification condition.

The nondisclosure condition raises a closer question. The DOJ asserts that the condition is concerned with protecting confidential federal law enforcement information and the liaison relationship between the federal and state or local partners. A narrow and unambiguous condition requiring jurisdictions to promise not to disclose imminent confidential federal criminal law enforcement operations in order to receive a law enforcement grant would be reasonable: the risk of harm to law enforcement officers and civilians would be significantly increased if lack of trust between federal and local partners caused the federal government not to disclose planned operations to their local counterparts. That would interfere with the ability to "maintain liaison." California and San Francisco agreed at the hearing that the desire to maintain confidentiality is reasonable and that they would not intentionally publicize confidential information concerning impending operations.

That said, the scope of the nondisclosure condition exceeds the narrow characterization offered by the DOJ, and it exceeds the ministerial duty to "maintain liaison." The duty to "maintain liaison…in matters relating to criminal justice," however expansively one reads it, does not venture into immigration enforcement more broadly. Yet the nondisclosure condition focuses not only on preventing disclosures related to harboring "fugitives of justice" but applies to "any alien." Further, it prohibits a "direct or indirect attempt" to harbor those individuals, as determined by the AAG. This language seeks the broadest coverage possible by its use of the term "indirect attempt," which has no boundary. It would be interpreted by the AAG. Given the current tension between federal and local authorities, it does not require much imagination to think that the AAG today might well consider many parts of the "sanctuary" laws as indirect attempts to harbor "aliens," despite rulings of courts around the country that have rejected DOJ's interpretations of its authority and the constitutionality of Section 1373.

The DOJ's interest in immigration enforcement is distinct from the criminal justice focus of the Byrne JAG Program. *City & Cty. of San Francisco*, 349 F. Supp. 3d at 946 ("Congress repealed the only requirement related to immigration that existed before, and it has failed to amend the Byrne JAG statute to add similar conditions since."). Congress knows how to grant broad discretionary authority but did not do so here. *See* 34 U.S.C. § 10446(e)(3) (Grants to Combat Violent Crime Against Women) ("In disbursing grants under this subchapter, the Attorney General may impose reasonable conditions on grant awards...."). There is no authority in Section 10102 for the DOJ to impose the fiscal year 2018 Byrne JAG nondisclosure or information conditions based on its authority to place "special conditions" on grants or its duty to "maintain liaison" in criminal justice matters.

**B.      Section 10153(a) Does Not Grant Authority to Impose the Fiscal Year 2018 Byrne JAG Challenged Conditions**

The DOJ contends that Section 10153(a), allowing the AAG to dictate the "form" of applications, and Section 10153(a)(5)(D), allowing it to require compliance with all "applicable Federal laws" in connection with the Byrne JAG awards, provide ample support for the nondisclosure and information conditions. The nondisclosure condition references statutes like 8

17

1    U.S.C. § 1324(a), while the information condition references compliance with Section 1373. *See*

2    DOJ Mot. for Partial Dismissal or Summ. J. at 7–8.[5]

3        California argues that the conditions violate the Tenth Amendment for three reasons: (i)

4    the statutory structure of JAG limits the "applicable Federal laws" to those related to the grant

5    application; (ii) laws identified in the fiscal year 2018 certifications do not apply to California or

6    its subdivisions at all; and (iii) even if Sections 1226, 1231, 1357, or 1366 were "applicable

7    Federal laws," the DOJ lacks authority to dictate what the state can do without violating

8    anticommandeering doctrine. San Francisco's Tenth Amendment arguments primarily concern

9    Section 1373, which I have already addressed. *See supra* Sec. I.

10       In the Byrne JAG Program, Congress has pre-determined who the eligible recipients are

11   and how much money they are to receive, but the operative statute leaves to the Attorney General

12   certain discretion to carry out parts of the program. For example, the Byrne JAG statute grants

13   authority to waive the "program assessment component" requirement, 34 U.S.C. § 10152(c)(1)–

14   (2), to add requirements to assure that the applicant report certain programmatic and financial

15   records "as the Attorney General may reasonably require," *id*. at § 10153(a)(4), and to require a

16   certification that "there has been appropriate coordination with affected agencies." *Id*. at §

17   10153(a)(5).

18       In the related litigation, I addressed whether Section 1373 (if it was constitutional) would

19   be an applicable law authorized by Section 10153(a)(5)(D). Starting with the text, I found that the

20   term "applicable" could hold both meanings proposed by the parties and agreed with the *City of*

21   *Philadelphia* and *City of Chicago* decisions that found the plain meaning of the text in the statute a

22   "close call." *City of Philadelphia*, 280 F. Supp. 3d at 619; *City of Chicago*, 264 F. Supp. 3d at

23   944. The text alone did not indicate an answer to the scope of authority included in requiring

24   compliance with applicable federal laws.

25       Turning to the statutory structure, I found that the "applicable laws" clause – located in the

26

27   _____

28   [5] The fiscal year 2018 JAG Solicitation requires other certifications of compliance with Section
     1373, Section 1644, Section 1324, and a certification to not "impede" federal officials' authority
     related to 8 U.S.C. §§ 1226, 1231, 1357, and 1366. *See* AR-1268.

last of four residual clauses within a proviso concerning the grant application – confined

"applicable" to the subject matter of the principal clause. *See Republic of Iraq v. Beaty*, 556 U.S.

848, 857–58 (2009). Therefore, "the phrase 'all other applicable Federal laws' refers to the

preceding clause requiring grant applications to include a certification 'in a *form* acceptable to the

Attorney General.'" *City & Cty. of San Francisco*, 349 F. Supp. 3d at 955 (citing 34 U.S.C. §

10153(a)(5) (emphasis added)). I reaffirm that view here.[6]

The DOJ's references to federal laws in the fiscal year 2018 certifications, to the extent

they are asserted as applicable at all, are not related to the grant application or its form. For

"applicable" laws like Section 1373 and Section 1644, the DOJ preserves its disagreements for

appeal. However, the DOJ does not argue against California's position that the other laws

referenced in the conditions are not applicable to the State at all. *See* DOJ Mot. at 19 ("the FY

2018 Byrne JAG conditions do not require California to comply with the other provisions – that is,

8 U.S.C. §§ 1226, 1231, 1357, and 1366."). If the federal laws mentioned in the new 2018

certifications are not "applicable Federal laws," their respective conditions are not authorized by

Section 10153(a).

California also argues that the anticommandeering doctrine would bar the challenged

conditions, even if Sections 1226, 1231, 1257, and 1366 were applicable laws. *See Murphy v.

NCAA*, 138 S. Ct. 1461, 1478 (2018) (finding prohibitions that "unequivocally dictate[] what a

state legislature may and may not do" violate the anti-commandeering rule as much as affirmative

commands.). I need not decide this now. The DOJ does not contend those laws, referenced in its

conditions, are "applicable" to California or San Francisco in the first place.

After reviewing the asserted authority of Section 10102 and Section 10153(a), I find that

Congress has not granted the DOJ the power to impose the nondisclosure or information

---

[6] The Third Circuit also held that Section 1373 was not an applicable law for purposes of the Byrne JAG program. *See City of Philadelphia*, 2019 WL 638931, at *9 (finding "it would be reasonable to view 'all other applicable Federal laws' to refer specifically to laws that apply to operations relating to the grant, not to require the City to certify compliance with every single law that might apply to it."). The court also stated that 34 U.S.C. § 10228(a), which prohibits the DOJ from "exercis[ing] any direction, supervision, or control over any police force or any other criminal justice agency," could be a statutory limit on what is "applicable" under Section 10153(a). *Id*. at *10.

19

United States District Court
Northern District of California

conditions. Accordingly, imposition of the challenged conditions is ultra vires and violates the separation of powers.

## III.     THE SPENDING POWER

Plaintiffs raise claims for relief premised on a violation of the Spending Clause of Article I, Section VIII of the United States Constitution, assuming for the sake of argument that Congress delegated to the DOJ authority to impose the challenged conditions on Byrne JAG funding. *See* SF FAC at 26; CA FAC at 35. Congress "may offer funds to the States, and may condition those offers on compliance with specified conditions." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012). However, if Congress intended to impose conditions on spending they must be "reasonably related to the purpose of the federal program." *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987) (O'Connor, J., dissenting).

Additionally, if Congress intended "to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Unambiguous conditions enable "States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id*. Courts thus view statutes "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [the] funds and the obligations that go with those funds." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

### A.     Relatedness

The Byrne JAG Program is a formula grant program for certain criminal justice purposes. 34 U.S.C. § 10152(a)(1); *see also City & Cty. of San Francisco*, 349 F. Supp. 3d at 959 (summarizing the criminal justice purposes of the Byrne JAG Program more thoroughly). The DOJ moves for dismissal or summary judgment, insisting that the nondisclosure and information conditions are sufficiently related to the federal interests in the Byrne JAG Program. *See New York v. United States*, 505 U.S. 144, 167 (1992) (stating that only "some relationship" is necessary between spending conditions and "the purpose of the federal spending."). Specifically, the DOJ asserts that the nondisclosure and information conditions insure that any funded program does not "thwart the federal government's exercise of its ability to remove aliens not lawfully present in the

20

United States or removable due to a criminal conviction." DOJ Mot. at 14:17–19.

San Francisco contrasts the immigration enforcement purposes of the challenged fiscal year 2018 conditions with Congress's purposes in creating the Byrne JAG Program—to support states and local law enforcement in eight permissible program areas related to "combat[ting] the most urgent public safety problems in their own communities." *City & Cty. of San Francisco*, 349 F. Supp. 3d at 959 (quoting 151 Cong. Rec. 25, 919 (2005)). I have already addressed why immigration enforcement conditions like the access and notice conditions were not sufficiently related to criminal justice to meet the relatedness requirement. *Id*. ("immigration law does not impact local law enforcement's administration and enforcement efforts in the criminal justice system."); *see also City of Philadelphia*, 280 F. Supp. 3d at 642, 642 ("Immigration law has nothing to do with the enforcement of local criminal laws.").

The same is true with the information condition, which appears to be included at least in part "to assess the accuracy" of the applicant's certifying compliance with Section 1373. DOJ Mot. at 8. Section 1373 is unrelated to Byrne JAG for all the reasons discussed in my prior Order. *See City & Cty. of San Francisco*, 349 F. Supp. 3d at 961 ("Requiring a certification of compliance with an inapplicable law would seem to exemplify un-relatedness."). Similarly, requiring the underlying information from grantees to assess their compliance with an inapplicable law like Section 1373 is equally unrelated. The immigration enforcement interests furthered by the information condition do not sufficiently relate to the federal interests in criminal justice of the Byrne JAG Program.

However, my prior analysis is not necessarily dispositive of the nondisclosure condition, a part of which could be reasonably related to Byrne JAG's purposes. *See Dole*, 483 U.S. at 213 ("Congress may condition grants under the spending power only in ways reasonably related to the purpose of the federal program."). The crux of DOJ's argument relies on an incident where the Oakland's mayor informed residents of an impending federal immigration operation on social media, allegedly compromising the operation and law enforcement safety.[7] The nondisclosure

---

[7] Plaintiffs dispute the underlying facts and whether this incident would apply to the nondisclosure condition. The evidence of what happened is not before me, and I take no position on it.

condition requires California and San Francisco to certify that they will not disclose confidential federal law enforcement information that relates to harboring both criminals and non-criminal immigrants. *See* DOJ RJN Ex. D ¶ 44.

Unlike the 2017 notice and access conditions, the nondisclosure condition's focus on protecting confidential federal law enforcement information expressly includes criminal and immigration enforcement. While immigration enforcement conditions had no relationship with any of the eight permissible Byrne JAG funded program areas, protecting the communication of confidential law enforcement information in exigent circumstances overlaps with some focuses of the program. *See, e.g.,* 34 U.S.C. § 10152(a)(1)(A) ("law enforcement program"); (E) ("drug treatment and [drug] enforcement programs"). Accordingly, protecting confidential federal law enforcement information has some relationship with plaintiffs' Byrne JAG funded programs. For example, California's Byrne JAG funding has in the past gone towards task forces on criminal drug enforcement, violent crime, and gang activities—all of which would share an interest in maintaining the confidentiality of federal law enforcement information. *See* Joll Decl. ¶ 15. San Francisco's funding appears to be more services-oriented, but it has also used funds for law enforcement programs "designed to reduce criminal behavior and improve public safety…" SF Mot. Summ. J. at 4; Chyi Decl. ¶¶ 10–11, 17 (discussing programs like Young Adult Court, Law Enforcement Assisted Diversion, Focused Drug Deterrence, and Drug Court Prosecution aimed at reducing recidivism).

That said, as California and San Francisco argue, the nondisclosure condition does not make a distinction between undocumented immigrants subject to potential criminal law enforcement and those who are not, even though "many immigration violations do not involve criminal law and are only violations of civil penalties." *City & Cty. of San Francisco*, 349 F. Supp. 3d at 960; *see also* 8 U.S.C. §§ 1182(a)(6)(A) & (9)(B), 1202(g), 1227(a)(1)(B). The nondisclosure condition is somewhat related to the federal interests in criminal justice, but for the reasons described below it does not pass muster because of its ambiguity.

### B. Ambiguity

California and San Francisco challenge the nondisclosure and information conditions as

ambiguous. I focus again on the nondisclosure condition because the analysis of the information condition is little different than the Section 1373 certification condition in the 2017 litigation. California argues that (i) the nondisclosure condition's authority under Section 10102(a)(2) is even more ambiguous than Section 10102(a)(6) or Section 10152(a)(5)(D), which I also found to be ambiguous; and (ii) the DOJ's own explanations of the nondisclosure condition does not enable grantees to knowingly participate "cognizant of the consequences." DOJ Ex. D ¶ 44. San Francisco adds that both conditions "cannot have been unambiguously authorized by Congress" because they were never statutorily authorized by Congress. *City of Philadelphia*, 280 F. Supp. 3d at 646.

The parties dispute whether the nondisclosure condition is clear by its text. The DOJ points to the Rules of Construction that define terms like "alien," "federal law enforcement information," and "public disclosure" for purposes of the nondisclosure condition. Each award document also directs applicants to ask the Office of Justice Programs questions on the meaning or scope of the conditions if anything is not clear. *See* DOJ RJN, Ex. C ¶¶ 42–46. The DOJ relies on cases from different circuits that each hold Congress "need not specifically identify and proscribe in advance every conceivable state action that would be improper." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004); *see also Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (finding that the nature of a grant condition can be indeterminate as long as its existence is clear).

DOJ's argument fails. For one thing, the nondisclosure condition suffers from the same problem identified by the court in *City of Philadelphia*: if there is no authority conferred by Section 10102(a)(2) enabling the DOJ's nondisclosure condition, then it cannot have been unambiguously authorized. *City of Philadelphia*, 280 F. Supp. 3d at 646 (finding the conditions "[c]annot have been unambiguously authorized by Congress if they were never statutorily authorized."). For another, the nondisclosure condition flunks the operative test of whether it allows grantees to participate in the Byrne JAG Program "knowingly," and "cognizant of the consequences." *Pennhurst State Sch. & Hosp.*, 451 U.S. 1, 17 (1981). The condition goes well beyond the DOJ's stated purposes. It is one thing to protect against disclosures of the kind allegedly made by Oakland's mayor. AR-01038–39. But it is quite another to require grantees to

23

comply with the unexplained and unbounded discretion of the AAG to avoid "indirect attempts" to disclose information.

California posits that it is unclear whether the condition prevents it from participation because of its TRUTH Act and Model Policies for K-12 schools. The TRUTH Act was enacted to "promote public safety" and transparency by subjecting local law enforcement who assist federal immigration enforcement "to meaningful oversight." 2016 Cal. Legis. Serv. Ch. 768 § 2(h), (i). The TRUTH Act classifies certain ICE records as public records under the California Public Records Act, and it requires that jurisdictions providing ICE with access to detention facilities hold community forums to inform the public about ICE access. Cal. Gov't Code § 7283.1(d). The State has found these forums helpful to "promoting accountability between law enforcement and the community." Goldstein Decl. ¶ 11.

California's K-12 Model Policies for responding to immigration enforcement were published in Assembly Bill 699, Cal. Ed. Code § 234.7(f)(1), to support students' "inalienable right to attend campuses which are safe, secure and peaceful." Cal. Const. art. I § 28(f)(1). The K-12 Model Policies require school employees to provide students and their families "with appropriate notice and a description of the immigration officer's request," along with any documents provided by the law enforcement officer, if there is a request for immigration enforcement information. CA RJN Ex. D at 20. School employees are also required to obtain consent from the student's parent or guardian before allowing them to be interviewed or searched for immigration enforcement purposes. CA RJN Ex. D at 31.[8]

At the hearing, the DOJ disclaimed any intent to reach the TRUTH Act's public forum requirements or the K-12 model policies by enforcement of the nondisclosure condition. Yet in its APA argument, the DOJ contended that California Labor Code § 90.2(a), requiring employers to

---

[8] Amicus Los Angeles Unified School District joins California in arguing that AB 699 and the K-12 Model Policies restrict schools from sharing information for immigration purposes potentially prohibited by the nondisclosure condition. *See* Amicus Brief (CA Dkt. No. 38). According to LAUSD, the State Legislature intended to support the view that "[c]hildren should be able to learn without fear and disruptions." S. Comm. on Education, analysis of AB 699, 2017- 2018 Reg. Sess. (passed as amended Sept. 15, 2017). It believes the nondisclosure condition is antithetical to the interests and policies of the State embodied by AB 699 and its K-12 Model Policies.

24

notify employees of records inspections by federal immigration authorities, was indicative of a larger problem in California in which undocumented employees are given an opportunity to leave before immigration officers detect them. Similar notice requirements are at issue with the K-12 Model Policies. California also notes that the federal government's own statements about California laws increase the ambiguity of its Byrne JAG application. *See* CA RJN Exs. E–G (citing the Acting ICE Director's statements suggesting that California laws violate the nondisclosure requirement).

The DOJ argues that intent is required to make an attempt to disclose information, even an indirect one. Perhaps so, but this does not clarify what conduct is proscribed; it merely leaves the AAG with authority to determine a violation "without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. 1071 or 1072 or of 8 U.S.C. 1324(a)." *Id*.

Even if Congress provided the DOJ with authority to impose the nondisclosure condition within the duty of Section 10102(a)(2) to "maintain liaison" or other laws (which I found was not the case), the breadth of the condition's scope render it ambiguous. It is not an answer to refer questions to the Office of Justice Programs—the scope must be clear from the condition so that prospective Byrne JAG applicants may make an informed choice, cognizant of the consequences.

## IV. ARBITRARY AND CAPRICIOUS CLAIM

The DOJ moves to dismiss or for summary judgment on California's arbitrary and capricious APA claim. It asserts that the claim fails because its reasons for imposing the condition and requirements "were entirely rational." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517 (2009). The DOJ insists that it was reasonable for the Office of Justice Programs to deny federal law enforcement funding to a jurisdiction that publicly discloses sensitive information in an attempt to harbor unlawful immigrants or fugitives from detection, or for refusing to provide information about its laws or policies on communicating with federal authorities.

In APA claims asserting that agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), the defendant agency is required to "examine the relevant data and articulate a satisfactory explanation" for their

actions. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Actions with a "rational connection between the facts found and the choice made" are valid. *Id.* In contrast, agency action should be overturned if the agency relied on factors Congress did not intend for it to consider, failed to consider important aspects of the problem, or its decision was counter to the evidence before it. *Id.* Thus, the reviewing court should "not supply a reasoned basis for the agency's action that the agency itself has not given," and should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (internal citation omitted).

The complete administrative record includes 1867 pages of documents. *See* Admin. Record (SF Dkt. No. 26; CA Dkt. No. 28). The DOJ argues its agency action for the new conditions was reasonable given an Office of Inspector General Memorandum regarding potential violations of Section 1373 (AR00366), emails to Byrne JAG grantees and state administering agencies (AR00392–97), the Backgrounder on Grant Requirements (AR00993), and social media posts from Oakland Mayor Libby Schaff (AR01038–39).

The 2016 OIG Memorandum and Backgrounder on Grant Requirements are the same documents that the DOJ unsuccessfully relied upon in the prior related litigation, and in *City of Philadelphia*, 280 F. Supp. 3d at 619–625. I found that the OIG Memorandum could not be relied on for establishing a "rational connection between the facts found and the choice made" because the choice to impose a Section 1373 condition was made before the Memorandum was issued, and the document did not purport to offer any post-hoc rationalizations for the decision. *State Farm*, 463 U.S. at 43. To rely on it would be circular as "a report concluding that many jurisdictions are not complying with Section 1373 does not justify imposing a condition requiring those jurisdictions to certify compliance." *City of Philadelphia*, 280 F. Supp. 3d at 624.

I have discussed why the Backgrounder is insufficient in two prior Orders. *See City & Cty. of San Francisco*, 349 F. Supp. 3d at 964; *see also State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1032 (N.D. Cal. 2018). To summarize the problem again, "[t]here is not a clear link…between localities keeping release dates or contact information confidential and more

26

dangerous or less safe communities." *City & Cty. of San Francisco*, 349 F. Supp. 3d at 964. This record concerns the fiscal year 2017 conditions, so it also lacks any explanation of the new nondisclosure condition.

Next, the DOJ cites two emails to Byrne JAG grantees and state agencies for the first time in this court and contends that they show the Section 1373 certification condition was put in place to protect the exchange of information between federal, state, and local law enforcement. AR-00392–97. Contrary to this claim, the emails merely provide "updated guidance" on Section 1373. *Id*. There is no portion of the emails that "articulate a satisfactory explanation for [the DOJ's] action." *State Farm*, 463 U.S. at 43.

Finally, the DOJ relies on social media posts from the Oakland's mayor to justify its imposition of fiscal year 2018 conditions. AR-01038–39. The posts are a new addition to the administrative record. They disclose that ICE "is preparing to conduct an operation in the Bay Area" within the next 24 hours and provide a link for residents to click-through to understand their legal rights in the event of being detained. *Id*.

California asserts that there is no evidence that one disclosure is indicative of a larger problem and that the nondisclosure condition is broader than what is necessary to address the problem. I disagree with the first contention. If the facts are as DOJ suggests, it does not need to wait for a larger number of disclosures of imminent law enforcement operations to justify acting. Treating the nondisclosure condition as a response to Mayor Schaff's disclosure at least begins to approach what the Court in *Bowman* described as "a decision of less than ideal clarity [in which] the agency's path may reasonably be discerned." *Bowman Transp.,* 419 U.S. at 286.

At the same time, the social media screenshots by themselves fail to explain the DOJ's decision to impose a nondisclosure condition that has much broader scope and application than the situation that purportedly inspired the condition. *See State Farm*, 463 U.S. at 50 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.") (internal citation omitted). Ultimately there are still "no findings and no analysis" in the administrative record "to justify the choice made" if the only document that supports a condition is a screenshot of the posts themselves. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S.

156, 167 (1962)(no support for remedy chosen by the Interstate Commerce Commission).

On this record the agency has not provided an articulated basis for the condition as drafted. The DOJ's justification and reliance on the social media posts without more, does not establish a "product of reasoned decision making." *State Farm*, 463 U.S. at 52. Although I can hypothesize how a nondisclosure condition in a significantly narrower form could be a reasonable response, there is a conspicuous lack of a record surrounding why the condition was imposed in its current form, where it could be used wittingly or unwittingly as a Trojan horse for acts and interpretations of the law that this court and others across the country have enjoined. *Burlington Truck Lines*, 371 U.S. 156, 168 (1962) ("courts may not accept appellate counsel's post hoc rationalizations for agency action."). I cannot fill-in my own or counsel's discretion for that of the agency. Accordingly, I find that the challenged conditions are arbitrary and capricious under the APA.

## V.    INJUNCTIVE RELIEF

The parties raise a now familiar dispute over the scope of the injunctive relief that is merited in this case. According to principles of equity, a permanent injunction is appropriate when: (i) a plaintiff "suffered an irreparable injury;" (ii) available remedies at law are "inadequate;" (iii) the "balance of hardships" between the parties supports an equitable remedy; and (iv) public interest is "not disserved." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). California and San Francisco are entitled to a permanent injunction in light of the finding that the fiscal year 2018 challenged conditions violate the separation of powers.

The remaining question is whether injunctive relief should have nationwide scope. Because the parties have stipulated to incorporating the arguments and supporting documents from the 2017 Byrne JAG litigation, the same record that supported a permanent nationwide injunction supports one here. Additionally, San Francisco and California provide evidence that the new fiscal year 2018 conditions apply and cause harm to jurisdictions nationwide. *See* SF RJN Ex. B, Chyi Decl. Ex. C (SF), Wright Decl. Ex. C (Somerville, Massachusetts); Nair Decl., Ex. 2 (Albuquerque, New Mexico). The conditions will continue to apply to jurisdictions without an injunction. *See* Jerzyk Decl. (Central Falls, Rhode Island); Wright Decl. (Somerville, Massachusetts); Reeve Decl. (Portland, Oregon); Springer Decl. (Denver, Colorado); Pittman

Decl. (Seattle, Washington); Segal Decl. (Minneapolis, Minnesota); Nair Decl. (Albuquerque, New Mexico); Muhammad Decl. (Chicago, Illinois).[9]

The DOJ offers the three arguments against a nationwide injunction that it made in the prior related litigation. First, it believes that plaintiffs lack standing to seek a nationwide injunction. It asserts the plaintiffs' "remedy must be limited to the inadequacy that produced [their] injury in fact," and therefore a nationwide injunction here would violate Article III standing. *See Gill v. Whitford*, 138 S. Ct. 1916 (2018) (rejecting standing for a statewide gerrymandering challenge because a plaintiff's remedy must be limited to his injury). Second, it restates the concern, of which I am mindful, that nationwide injunctions risk preventing "legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). Finally, similar litigation is pending in other jurisdictions. *See City of Los Angeles v. Whitaker*, No. 2:18-cv-07347-R-JC (C.D. Cal.); *City of Chicago v. Whitaker*, No. 1:18-cv-06859 (N.D. Ill.); *City of New York v. Whitaker*, No. 1:18-cv-06474-ER (S.D.N.Y.); *City of Providence v. Whitaker*, No. CA-18-437-JJM-LDA (D.R.I.).

Neither party offers convincing reasons for me to deviate from the prior Order in the related 2017 litigation. The appropriateness of nationwide injunctive relief for the 2017 Byrne JAG conditions applies equally in 2018. *See City & Cty. of San Francisco*, 349 F. Supp. 3d at 973 (granting but staying the nationwide injunction because the Ninth Circuit might disagree about the constitutionality of Section 1373 and "because the laws and practices of each 'sanctuary' jurisdiction differ.").

California and San Francisco have shown that Section 1373 is unconstitutional and that there is a violation of the separation of powers, which supports nationwide relief. *City & Cty. of*

---

[9] Amici 46 Counties, Cities, and Local Government Organizations further shed light on the benefits of the Byrne JAG Program, as well as the far-reaching consequences of the fiscal year 2018 challenged conditions. *See* Amicus Brief (SF Dkt. No. 54). They argue that a nationwide injunction is the only remedy for local governments that are faced with the precarious decision to submit to the DOJ's conditions or forego important funding for local programs that benefit their communities. *Id*. at 10–12.

*San Francisco*, 897 F.3d at 1232; *see also Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017) (finding that relief limited to the parties in suit where there was a likely constitutional violation "would not cure the constitutional deficiency, which would endure in all [its] applications."). As set forth above, the nondisclosure condition is defective for different reasons. But those reasons are also applicable to jurisdictions throughout the country; no factual differences would cause a different legal conclusion. Accordingly, I grant the injunction in favor of plaintiffs but stay its nationwide scope.

## VI. MANDAMUS RELIEF

California seeks mandamus relief to compel the DOJ to issue and disburse fiscal year 2018 Byrne JAG funds without the challenged conditions. CA FAC ¶ 138; Prayer for Relief ¶ 4. The DOJ disputes the need for mandamus relief in a footnote, stating that it already issued fiscal year 2018 Byrne JAG awards to California and its subdivisions and has mooted this request. However, the parties agreed to an extension on the deadline for accepting the awards until after I rule on the dispositive motions at issue here. Sherman Decl., Ex. 7.

Consistent with the *TRAC* factors traditionally used to evaluate mandamus relief, I find that the facts support mandamus relief for California. *See Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (citing *Telecommc'ns. Research & Action v. FCC* (TRAC), 750 F.2d 70, 79–80 (9th Cir. 1984)).

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

750 F.2d at 80 (citations and internal quotation marks omitted).

The Byrne JAG formula grant is an annual program; delay in disbursal impacts human health and welfare dependant on the Byrne JAG funded programs. It remains undisputed that

California risks discontinuing its Byrne JAG programs if it loses funding.  Expediting disbursal would not prejudicially affect the federal government's related interests in federal immigration enforcement or maintaining the confidentiality of law enforcement information.  Mandamus relief is appropriate.

## CONCLUSION

For the reasons stated, California and San Francisco's motions for summary judgment are GRANTED and the DOJ's motions for partial dismissal or partial summary judgment are DENIED.  Plaintiffs shall prepare a proposed judgment and shall meet and confer with the DOJ concerning its form.  Within two weeks of this Order, the parties shall either submit a stipulated form of judgment or two competing versions, with DOJ's proposed revisions to plaintiff's form in track changes, along with a Joint Statement if necessary of no more than five pages in length explaining any disagreements.

**IT IS SO ORDERED.**

Dated: March 4, 2019



William H. Orrick
United States District Judge